## NATIONAL LABOR RELATIONS BOARD *v.* INDIANA & MICHIGAN ELECTRIC CO. ET AL.

No. 73.   Argued November 13, 16, 1942.—Decided January 18, 1943.

---

*Mr. Ernest A. Gross,* with whom *Solicitor General Fahy* and *Messrs. Richard S. Salant, Robert B. Watts,* and *Morris P. Glushien* were on the brief, for petitioner.

*Messrs. Murray Seasongood* and *Eli F. Seebirt* for Indiana and Michigan Electric Co., respondent.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The court below granted respondent Indiana and Michigan Electric Company's petition to remand the case to the Labor Board to hear additional evidence as to a course of depredations, including dynamitings, committed, it is alleged, by Local B-9 of the International Broth-

erhood of Electrical Workers, on the Company's properties during the pendency of the case. It directed that the Board make findings on such evidence, include it in the transcript, and make such modifications, if any, in its order, as the evidence might require. The court expressly refrained from passing on questions as to the bias and partisanship of the Trial Examiner and the sufficiency of the findings and of the evidence, raised by the Board's petition for enforcement and the answer thereto. The importance of the questions raised to enforcement of the Act prompted us to grant certiorari.[1]

For present purposes we take to be true the facts stated in the petition or offer of proof on the basis of which the court below directed a remand. These facts were stated on oath, and have not been denied. Petitioner says that we must hold that even if true they are immaterial. On this assumption of truth the case is as follows:

On November 12, 1938, Samuel Guy, the Business Manager of Local B-9 of the International Brotherhood of Electrical Workers, filed in amended form with the Board charges that the Company had been guilty of several unfair labor practices. On the same day the Board through its Regional Director issued a complaint against the Company, setting November 28, 1938, as a hearing date, and events of violence ensued in the following sequence as related to the Company's steps in defense of the case:

The Company filed its answer on November 23, 1938. On the following day, four days before the hearing, cables at one of the Company's South Bend substations were dynamited. The hearings proceeded, and the Trial Examiner's intermediate report recommended generally against the Company.

---

[1] 316 U. S. 657. The decisions below are reported at 20 N. L. R. B. 989 and 124 F. 2d 50.

On September 1, 1939, the Company filed its exceptions to the intermediate report. On September 5, three of its transmission line poles were sawed off, and on September 8, a transmission line tower was dynamited. On October 17, 1939, the oral hearing on the exceptions was set before the Board at Washington for November 9, 1939. Two days later another transmission line tower was dynamited. On October 28, two transmission poles at different locations were dynamited. Another transmission tower was so destroyed on October 30, ten days before the oral hearing, and two more at different parts of the system on November 23, 1939. All carried high voltage lines, and some were located along public highways or railroad tracks.

On February 19, 1940, the Company filed with the Board a petition to reopen the case and receive further evidence. This petition alleged the commission of the depredations upon its property as set forth above and further that: John R. Marks, Assistant Business Manager of Local B–9, and Earl Freeman, one of its members, both of whom had been witnesses against the Company, and three others, were arrested after February 1, 1940, and charged with the commission of some or all of the depredations, and with having conspired to commit them all. Except Marks, each had made confessions stating that Marks paid them sums of money aggregating $2,325 for committing such acts. One of them stated that Marks had caused the first dynamiting to intimidate the Company in connection with the hearing and three stated that he had caused the later ones to intimidate it in connection with the oral argument. The Company proposed by the evidence of dynamiting to discredit Marks and Freeman, on whose testimony the Trial Examiner appeared to rely. It also sought to discredit Guy, who also had been a witness, on the claim that he knew, or must have known, of the use of the $2,325 of the Union's money for the purpose of destroying respondent's property. But it claimed

more. It asserted evidence of a conspiracy to destroy property to influence the pending case, which it contended was not a good-faith labor controversy, but an unlawful effort of Local B–9 to coerce the Company to require its employees to join the union.

On February 28, 1940, the Board denied the Company's petition. It held that "the matters recited therein have no relation to the issues in this proceeding." The Board went on to make findings on the issues, expressly reciting that it did so "upon the entire record in the case." While the Board did not designate all of the testimony for printing, it has certified it all to us, it has stricken no testimony of any witness in question from the record and has made no finding that any specific parts of it were not relied upon.[2]

The report of the Trial Examiner, Dudley, had held the Company's attitude to be hostile and obstructive toward the effort to unionize its men, relying substantially on events as to which Guy, Marks, and Freeman had testified. The Board findings made but little reference to the activities of Guy and no reference at all to Marks, but reached the same conclusion as to the attitude of the

[2] Section 10 of the Act provides: "(c) The testimony taken . . . shall be reduced to writing and filed with the Board. Thereafter, in its discretion, the Board may upon notice take further testimony or hear argument. . . . (d) Until a transcript of the record in a case shall have been filed in a court, as hereinafter provided, the Board may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it. (e) The Board . . . shall certify and file in the court a transcript of the entire record in the proceeding, including the pleadings and testimony upon which such order was entered and the findings and order of the Board. Upon such filing, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to . . . enter upon the pleadings, testimony, and proceedings set forth in such transcript a decree . . ." 49 Stat. 454, 29 U. S. C. § 160.

14

Company. The examiner had recommended ordering immediate and full reinstatement of Freeman and that he be made whole for all lost wages. The Board did not follow that recommendation. The examiner had recommended an order that the Company withdraw all recognition from respondent Michiana Association as representative of employees upon the ground of company promotion and domination, and the Board so found and so ordered. The examiner had also recommended that the Company be ordered to cease and desist coercing employees in their right, among other things, to "join or assist the International Brotherhood of Electrical Workers, Local B–9." The Board order dropped the name of the union, but ordered respondent generally to cease and desist from interfering with its employees in the exercise of their right "to join or assist labor organizations."

On December 13, 1940, the Board petitioned for enforcement of its order and on July 29, 1941, the Company petitioned the Circuit Court of Appeals for a remand to the Board pursuant to § 10 (e) of the National Labor Relations Act. This petition referred to the earlier petition to the Board and set forth under oath in addition that: Marks, Freeman and another member of the Brotherhood had been convicted of one of the dynamitings described in the petition and sentenced to terms of from two to fourteen years in the state penitentiary; and two others had pleaded guilty of other of the depredations. Marks had said he obtained all of the money to purchase dynamite and pay the dynamiters from the treasury of International Brotherhood of Electrical Workers, Local B–9. The petition also recited that during the hearings the Trial Examiner asked a conference with the company attorney and urged settlement of the case. He was told of the dynamiting of November 24, 1938, and given references to articles about the practices and methods of the officers of this union, and to the record in *Boyle* v. *United States*, 259 F.

803, in which the Circuit Court of Appeals for the Seventh Circuit had affirmed a conviction of Michael J. Boyle, its International Vice-President, and severely condemned his methods in labor matters. The examiner replied, "Well, your Company will be required some time to recognize B-9 and you might as well do it now." On three separate later occasions different attorneys or officers of the Board were informed of the depredations, but continued to urge the Company to cease resistance in the case. The truth of these statements has not been denied. Finally, the Company asserted in its petition to the Court that on reopening it would be able to prove that the Board's witnesses (not limited to Guy and Marks and Freeman) were of such character that they are not entitled to credit and belief, and that the case had no relation to the purposes of the National Labor Relations Act.

The court below stated as one ground of the Company's case for remand that the tendered evidence was material for the purpose of "impeaching the credibility of witnesses before the Board on whose testimony the Board relied for its finding of ultimate facts." After referring to the testimony of Guy and Marks, it said that "at the time of the trial, the evidence adduced on the trial of the criminal cases in the Indiana State Court involving these witnesses, was not available to respondent or to the Board. The new evidence is of such character that its consideration by the Board would probably produce a different result." In support of its remand it went on to say that the question whether the supervisory employees whose activities had been found by the Board to constitute coercion on the part of the Company "were acting on their own behalf and that of their co-employees, or at the behest of the respondent, is the crux of the case. . . . The new evidence may throw some light on the issue of employer domination."

16

Section 10 (e) of the National Labor Relations Act authorizes the Circuit Court of Appeals to order additional evidence to be taken when it is shown "to the satisfaction of the court that such additional evidence is material," and that there were reasonable grounds for the failure to adduce the evidence at the hearing.[3] In *Southport Petroleum Co.* v. *Labor Board,* 315 U. S. 100, 104, we sustained the Board's contention and held that an application for leave to adduce additional evidence thereunder "was addressed to the sound judicial discretion of the court." The Board does not suggest that a different construction should be put upon the Act when the court below decides against, rather than for, it. The question it has submitted for our decision is whether the court below "acted arbitrarily" and "abused its discretion." Thus, in order to decide this case in favor of the Board we would have to hold not merely that the evidence of dynamiting would be a matter of indifference in our own view of the case, but that the court designated by statute to exercise discretion in the matter and which desired to know the facts about it before passing on the sufficiency of the evidence and the impartiality of the examiner and which thought the finder of the facts should hear and consider such evidence, must not only have been in error but must also have abused its judicial discretion.

The Board argues that the decision below must be reversed on the grounds that the court erred in holding that misconduct of the complainant before the Board would go to the Board's jurisdiction; that, as it contends, the court held that a remand might result in the impeach-

---

[3] 49 Stat. 454–455, 29 U. S. C. § 160 (e):

". . . . If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the transcript. . . ."

ment of the credibility of Guy, Marks and Freeman, whose testimony was either cumulative (being corroborated by other witnesses) or entirely immaterial and not relied upon by the Board; and that there is other substantial evidence in the record to support the Board's decision. The specifications of error in the petition for certiorari did not, however, take this narrow compass, but extended to the propriety of the ruling of the court below upon the whole case.[4] We have not confined ourselves to the scope of the Board's view of the case, and have examined all the evidence in the certified transcript, and not merely the evidence set forth in the printed record.[5]

We cannot agree with the view of the Circuit Court of Appeals that the evidence might disqualify Local B–9 from making the charge of violation against the Company or deprive the charge of force and effect, and thereby defeat the Board's jurisdiction to hear the case.

The Act requires a charge before the Board may issue a complaint, but omits any requirement that the charge be filed by a labor organization or an employee.[6] In the legislative hearings Senator Wagner, sponsor of the Bill, strongly objected to a limitation on the classes of persons who could lodge complaints with the Board. He said it was often not prudent for the workman himself to make a complaint against his employer, and that strangers to

---

[4] "1. The court below erred in remanding the case to the Board for the taking of additional evidence as to the unlawful conduct of the union which filed the charge against respondent.

"2. The court below erred·in remanding the case to the Board in order that the testimony of certain witnesses might be impeached.

"3. The court below erred in failing to enforce the order of the Board."

[5] *Stromberg* v. *California*, 283 U. S. 359, 368; *McCandless* v. *Furlaud*, 293 U. S. 67, 71.

[6] § 10 (b), 49 Stat. 453, 29 U. S. C. § 160 (b) provides that "Whenever it is charged that any person has engaged or is engaging in any such unfair labor practice, the Board . . . shall have power to issue . . . a complaint. . . ."

the labor contract were therefore permitted to make the charge.[7] The charge is not proof. It merely sets in motion the machinery of an inquiry. When a Board complaint issues, the question is only the truth of its accusations. The charge does not even serve the purpose of a pleading. Dubious character, evil or unlawful motives, or bad faith of the informer cannot deprive the Board of its jurisdiction to conduct the inquiry.

While we hold that misconduct of the union would not deprive the Board of jurisdiction, this does not mean that the Board may not properly consider such misconduct as material to its own decision to entertain and proceed upon the charge. The Board has wide discretion in the issue of complaints. Indeed it did not act on a charge earlier made by the C. I. O. against the same employer. It is not required by the statute to move on every charge; it is merely enabled to do so.[8] It may decline to be imposed

---

[7] Hearings before the Committee on Education and Labor, United States Senate, 74th Cong., 1st Sess., on S. 1958, Washington, Government Printing Office, Part 3 (1935), pp. 439–442.

[8] Compare the following statistics on the disposition of charges filed with the Board:

| | Percentage of total cases on docket for fiscal years ending: | | | |
|---|---|---|---|---|
| Cases closed before issuance of complaint: | 1937† | 1938‡ | 1939* | 1941** |
| By settlement | 32.1 | 34.5 | 27.9 | 30.3 |
| By dismissal | 13.5 | 13.4 | 7.6 | 9.7 |
| By withdrawal | 7.4 | 17.7 | 17.8 | 20.6 |
| By other means | .2 | 1.2 | .5 | .2 |
| Cases disposed of after issuance of complaint | 3.0 | 2.5 | 5.5 | 6.6 |
| Cases pending | 43.6 | 30.7 | 40.7 | 32.7 |

†Report of the National Labor Relations Board (1937) 20.
‡Report of the National Labor Relations Board (1938) 31.
*Report of the National Labor Relations Board (1939) 34.
**Report of the National Labor Relations Board (1941) 26.

Statistics for 1940 are set up on a slightly different basis, but indicate a trend like that of the years set forth above. Report of the National Labor Relations Board (1940) 20.

upon or to submit its process to abuse. The Board might properly withhold or dismiss its own complaint if it should appear that the charge is so related to a course of violence and destruction, carried on for the purpose of coercing an employer to help herd its employees into the complaining union, as to constitute an abuse of the Board's process.

The Company claims support for this inference as to the purpose of the organizers in the testimony of Guy, Business Manager of Local B–9. It appears that he and Marks, his assistant, called on Thomas F. English, operating head of the Company, in the Spring of 1937. Guy testified that the purpose was "along the lines" of getting the assistance of English in causing the employees to come into Local B–9 instead of into a C. I. O. union or an independent union. Guy said, "we decided" to "take over the organization" of the men, that "we had jurisdiction in this particular community or part of the State, and if they were going to be organized that they rightfully belonged in our organization." Their proposition to the Company that it cause the men to join Local B–9 was a proposal to violate the National Labor Relations Act, whose purpose is to protect the workmen from employer pressure and leave them free to choose for themselves whether, and with whom, they will associate. The Company refused, and English later warned that the organizers must cease representing to the men that the Company favored Local B–9.

Later another meeting was called by a Field Examiner for the National Labor Relations Board, attended by the Field Examiner, Guy, Marks and Company representatives. On questioning, Guy recalled that Boyle, Vice-President of the Brotherhood, had also been there. The company attorney made an offer of proof at the hearing that this meeting was held on May 5, 1938, at the instance of the Field Examiner, who stated that a series of inci-

dents recited constituted a violation by the Company of the Labor Relations Act and "asked Mr. Boyle what recommendation he would make." The Trial Examiner rejected the proof.[9]

Apart from the materiality of the additional evidence on the question of the Board's discretion as to whether it would institute or continue a case on the recommendation and charges of this informer under the circumstances now appearing, its materiality on other branches of the case is sufficiently established to support the Court's exercise of discretion in ordering taking of new testimony. We think this course of violence and lawlessness concurrent with the Board proceedings, apparently instigated by those who stand to gain from the Board's decisions, participated in by parties and witnesses, may not be said to lack possible materiality on other issues of the case. The question goes to the fairness of giving absolute finality to the Board's findings of fact where there has been a refusal to hear and incorporate in the record such evidence as may be produced of such a conspiracy.

The testimony ordered to be heard goes to the credibility of Marks and Freeman, and perhaps to that of Guy, three witnesses whom the Board's staff thought useful to call, and on whom the examiner plainly relied. The Board expressly accepted and relied upon the version of events as to which Guy testified.[10] Local B–9 was a party

---

[9] This was on November 28, 1938, the first day of the hearing. On December 9, 1938, the last day of the hearing, Charles B. Calvert, English's assistant, testified without objection that Boyle's response was "I guess that is about it."

[10] The Board found that: Earl Livelsberger, one of the Company's general line foremen, and Glenn Carlton, his assistant, were among those invited to attend a meeting of Local B–9 in April, 1937. During the course of the meeting, Guy, learning from several Company employees that they were sitting in a car outside the meeting hall, left it and invited them to come to the meeting. Carlton declined, stating

to the proceeding and appeared throughout the hearings by Guy, who managed its interests. He, the Business Manager, was the first witness; and Marks, his assistant, the second. Aside from English, operating head of the Company, and employees who were members of what the

---

that he could get the information anyway. Carlton and Livelsberger were in a position to observe, and did observe, who attended the meeting. "The fact that Guy's attention was called to the presence of Livelsberger and Carlton indicates that the respondent's employees were aware of the supervisory surveillance of their meeting place. . . . Although Livelsberger and Carlton were invited to the meeting and therefore their attendance at the meeting itself would not have discouraged membership in the Brotherhood, it is clear, and we find that their stationing themselves outside the meeting place was for the purpose of scrutinizing those who entered and thereby discouraging employees from attending such meetings." It also found that since Livelsberger and Carlton were supervisory employees whose activities were attributable to the Company, their conduct constituted a violation by the Company of the rights guaranteed the employees in § 7 of the Act.

Carlton and Livelsberger, called as witnesses for the Company, admitted being across the street from the hall at the time of the meeting. Livelsberger testified that he had belonged to the Brotherhood for three years after 1919, but got "disgusted" and dropped out; and that he did not go into the meeting because "I didn't see anyone there that I cared much about association in membership with." Carlton testified to the same effect as to his reason for staying out. There were about fourteen men at this meeting, including Claude F. Buckley, Dewey Edwards, Guy, Albert Otis and Lester Shields.

Frank Claeys testified that he saw Carlton outside, and "wanted to get out of there," but that he had nevertheless attended the meeting. Guy testified that Buckley, and probably others, had told him of Carlton's presence outside the hall, and that when he went out and invited Carlton to attend and learn firsthand what was going on, he was told by Carlton that he would get the information anyway. Ralph L. Hoblitzel was the only one to corroborate this statement, and Carlton denied having made it.

As to Buckley, Claeys, Edwards, Hoblitzel, Otis and Shields, all Board witnesses and affiliated with Local B-9, see the following discussion.

Board found to be a company-dominated union,[11] the Board called twenty witnesses. Of these, fourteen besides Guy, Marks and Freeman, were affiliated with Local B–9.[12] Of these fourteen, eight had come to work shortly before or during Local B–9's organizing campaign which, as Guy and Marks testified and the Board found, began in the Fall of 1935.[13] One of these, Buckley, admitted knowing Boyle, and Marks testified that he knew Buckley before he came to work for the Company. Marks also testified that he began organizational efforts by getting in touch with Buckley and Shields, who, like Buckley, came to work in 1935. Buckley called the first meeting for Local B–9 among the Company's employees. Edwards, an officer of Local B–9, was another of the new employees who figured in the case. He testified that he had known Marks for approximately four years and had seen him "quite a number of times" and in "a number of places." Otis, another 1935 arrival, went from Chicago, where he was employed at the time of the hearing, to South Bend to see a sick friend whom he had not seen or corresponded with for a year. On the way he happened to see Edwards out in a field hunting, and talked to him there. This was around Thanksgiving time of 1938. The South Bend substation was dynamited November 24, 1938. The company attorney on cross-examination asked "What did you talk about?" Otis answered: "That

[11] Witnesses presented by the Board and affiliated with respondent Michiana were: Geraldine Carlson, Ray M. Collins, Taylor Edgell, George S. Holmes, and Nelson D. Lambert.

[12] Claude F. Buckley, Frank Claeys, Ernest Durfey, Dewey Edwards, Forrest Elkins, E. J. Ernst, Charles A. Havlin, Ralph L. Hoblitzel, Walter Hulwick, Russell H. Kidder, Eugene S. Lee, Albert Otis, Earl Seeley, and Lester Shields. Three others of the Board's witnesses were affiliated with the C. I. O.

[13] Otis, April, 1935; Edwards, May, 1935; Buckley and Hulwick, July, 1935; Shields, August, 1935; Durfey, October, 1935; Seeley, October, 1936; Elkins, May, 1937. Kidder came to work in September, 1934.

is none of your business either." The Board attorney then objected to the question, which was never answered beyond a denial that they talked about the Company. Otis was twenty-seven years old at the time of the hearing and had worked for at least ten public utility concerns and one manufacturing plant in a short period. Asked on cross-examination the reason for his peculiarly acute memory in respect to the period of his employment by another electric company, he answered that it was because "an incident happened that isn't any affair of the court." Freeman, one of those convicted of the dynamiting, was a witness, testified at length as to alleged unfair practices of the Company, as did others affiliated with Local B–9, including those mentioned above.

It is idle in this context to say that because the Board now denies it relied on the evidence of the two who were convicted, because it was willing to omit their testimony from the record, and because it rejected the examiner's recommended relief to Freeman, the door should be closed to any inquiry about the knowledge or responsibility of members of this group for these acts of violence. The items recited and many others revealed by the transcript of testimony, as well as the printed record, give support for the lower court's belief that the evidence, if taken, might change the results. The convicted witnesses and many of the others on whom the Board must have relied were not only co-members of Local B–9, but they were coöperating in promoting its fight against the Company. It is unrealistic to say that this union was granted nothing by the Board's order or that no relief has been given to this particular union. The C. I. O. had practically withdrawn [14] and the Board's order disestablishes respondent

[14] A C. I. O. charter had issued to a group of Company employees in April, 1937. This group met with little success, and, failing to get the assistance of an organizer from the main body, the men transferred to Local B–9 in October, 1937.

Michiana. This not only leaves the field free to Local B–9 and breaks up the only center of resistance to it, but the Board prohibits any interference with the employees' right "to join or assist labor organizations." That includes this one, and for practical purposes at this time, none other. Local B–9 was the complainant, its effort to organize was at stake, and the relations shown are such that cross-examination to ascertain whether the witnesses had any part in such violence would appear proper. It must be remembered that not only is the credibility of these men involved, but the decision itself turns on an interpretation of their acts and of the acts and attitudes of supervisors toward them and whether the employees were in good faith in testifying to the reasons for preferring an association of their own to Local B–9. We see no reason why witnesses so identified with the organizing effort of the dynamiters should not be questioned on a subject that might reveal bias in their testimony and might also explain acts of alleged discrimination against them.

We especially see no reason for holding that officers or members of Local B–9 should be spared such inquiry when the subject was thought by the Trial Examiner a fit one on which to examine the head of the employees' association. One George S. Holmes was president of respondent Michiana, which the Board holds to be the product of unlawful company activity and orders to be disestablished. He was a distribution engineer who had been employed by the Company for many years. After testifying to his understanding of the reasons for the formation of Michiana as being the fact of outside organizations "creating a disturbance and jeopardizing the present working conditions," the relative amounts of dues [15] and directness of

---

[15] Marks testified that dues in the Brotherhood were $1\frac{1}{2}\%$ of average earnings, and initiation fees $10 for journeymen and $7 for helpers. Dues for Michiana were 25¢ per month, with an initiation fee of $1.

approach to the company officials through Michiana,[16] he was questioned by the Trial Examiner. One of the questions put by the Trial Examiner was "Supposing that there was an organization formed to throw bombs at the company's plant every Saturday night, would you become president of such an organization?" Holmes said that he doubted that extremely. The examiner also asked him, in connection with his attitude as to the proper technique of bargaining with the Company, "Would you suggest cutting down electricity and turning off electric lights?" He was told by Holmes that ". . . if you get the entire community adversely prejudiced against you, you would have tough going, regardless of how you acted toward the company." If questioning as to hypothetical bombings was deemed material and relevant to discredit Holmes' claim of independence of Company domination, which is the only purpose apparent, we would think it a little difficult to contend that it is improper to inquire as to the attitudes of those closely associated with those convicted of actual bombings as to their knowledge and attitude in relation to them.

It is at least reasonably conceivable that further inquiry into the depredations will bear not only upon the effect to be given the testimony of any further participants or conspirators thereby disclosed, but also upon that of witnesses whose testimony might without such inquiry be taken to indicate company domination of Michiana. Many supervisory and other employees voiced opposition

[16] According to the testimony of Guy and Marks, grievances as to wages and working conditions were considered by local bodies set up within B–9, and then referred to Marks, who would endeavor to adjust them. If he failed, the matter would be taken up with Guy in Chicago, who, with the executive board and membership of the main body— variously stated by Guy to number from 2,500 to 3,500—would decide the matter. Local bodies apparently had no power to settle their own grievances by approaching the management.

to the intrusion of "outsiders" into their affairs.[17]  Present knowledge and further investigation of the depredations seem not altogether unlikely to lend credibility to their testimony that they had acted to protect their own interests and not as participants in Company interference. Testimony of employees that they organized Michiana because they did not wish to accept the leadership of Local B–9, and that Michiana was the product of their own preference rather than of Company pressure or interference, has been wholly disbelieved by the Board.  It

---

[17] Two examples suffice:

The Board made a number of findings with respect to the activity of Jack Betly, a lineman employed by the Company since 1929, who had been particularly active in the organization of Michiana.  It quoted from a petition which he had circulated.  The petition was entitled "S. A. F. E.", and read in the part quoted by the Board as follows: "We, the older men in the employ of this company, believe that we have men among us that can intelligently arbitrate with the management without resorting to radicalism and dictation of outsiders.  Our meeting will be posted in the near future."  Some time before Betly got out his petition he had been solicited by Otis, Shields, and Marks to rejoin the Brotherhood, to which he had belonged in 1915.  According to his testimony, they had called him out in the evening to their car, and had refused to come into his home, thus causing him some uneasiness.  He was invited to attend, and did attend, the first Local B–9 meeting.  He testified further that at a later meeting he had difficulties with Otis who "took a slough" at him and bumped his head against a wall, and that shortly after this he went home and got out his petition.

The Board also quoted at some length from the testimony of Harter, a foreman, as to his questioning of employees with respect to Local B–9 matters, and found that such questioning constituted a violation by the Company of the Act.  His story was that the men he questioned were members of his line crew who had been acting "tight" and as though they had more on their minds than linemen working on charged inter-city power lines should have; that his questioning divulged similar visits by Shields and Otis upon two of the three men in his crew; and that outside unions were "bothering . . . I know I was wondering if they was going to move their trunks in and put up at my place, or whether I would have to move out and let them in."

might well be rejected when Local B–9 appears only in the light of an ardent but lawful champion of workmen's welfare. The testimony of many employees was critical of Local B–9, but the grounds were not clearly articulated. But their aversion to the B–9 leadership, disbelieved by the Board when no very tangible reason was brought out to explain it, may be entirely credible when it appears that even poorly explained apprehensions were justified and that there was ample reason for avoiding entanglement with the men who officered Local B–9 and who are now convicted—injuring no doubt the cause of those whom they were trying to "take over."

Undoubtedly, an element of fair judicial discretion vested in the court below consists of respect for a wide range of discretion in the Board itself as to when it should or should not inquire into allegations of violence or threats of violence by witnesses or parties before it. It must not be overlooked, however, that the evidence on which the Court reopened this case was substantially different from that on which the Board refused to do so.[18] Charges that violence has been threatened or encouraged are frequent and easy in negotiations that proceed in an air of belligerency. Both sides regard labor relations as tough business, and not only vital interests but passions and sensitivities as to prestige are involved. Neither side is lightly to be held answerable for acts where responsibility cannot be fixed. Few tasks of leadership are more difficult than

---

[18] Facts appearing in the petition to the Court not contained in the petition to the Board were: the conviction of men who had earlier confessed, and of Marks, who had not confessed; and the efforts by the Trial Examiner during the hearing, and by other attorneys or officials of the Board after the hearing, to get the Company to consent to disestablishment of Michiana despite charges that the Local had caused the dynamitings.

It also appeared from the Board's response to the petition to the Court that at least one of the non-employee dynamiters hired by Marks was also a member of the Brotherhood.

those which confront those who represent labor. If they are gentle, they are often unheeded; and if they are blunt, they are often held up as menacing. The Board is not required to sidetrack proceedings involving an employer's violation of the labor law while it explores irrelevant derelictions of parties or witnesses or acts of unknown or irresponsible persons.

The Act accords a great degree of finality to the Board's findings of fact, and this Court has been insistent that the admonition of the Act be strictly observed. But courts which are required upon a limited review to lend their enforcement powers to the Board's orders are granted some discretion to see that the hearings out of which the conclusive findings emanate do not shut off a party's right to produce evidence or conduct cross-examination material to the issue. The statute demands respect for the judgment of the Board as to what the evidence proves. But the court is given discretion to see that before a party's rights are finally foreclosed his case has been fairly heard. Findings cannot be said to have been fairly reached unless material evidence which might impeach, as well as that which will support, its findings, is heard and weighed.

We will not assume in the circumstances of this case that the Board will in any event refuse to modify its conclusions. Since the court below has not yet passed on the issue of sufficiency of the evidence to sustain the finding that Michiana is a company-dominated union, any assumption that it is such can be only tentative unless we are to deny the Company the right to review granted by the Act. One of the very issues yet to be decided, and on which the court below desires the light of additional evidence, is whether Michiana was, as its officers and members testified, a true employee organization, formed to get away from Local B–9, or whether it was a company tool, as the Board has inferred from testimony, much of it from

Local B–9 sources. We have no warrant to assume that the Board will find that it is company-dominated, no matter what the additional proof may show as to the motives of the men who organized it. We do not prejudge the issue—we hold only that it is not unreasonable or an abuse of judicial power to reserve judgment on it until the full story has been heard and judged by the Board itself.

The Labor Relations Act contemplates submission of disputes as to labor practices of employers to reasoned and impartial determination after full and fair hearing. If by that procedure there is found wrong-doing on both sides, the Board can act to prevent the employer wrong-doing prohibited by the Act, even though it can not reach other wrong-doing. But the process of presenting cases to it must be kept free from forces generating bias or intimidation. Dynamiting or display of force by either party has no place in the procedures which lead to reasoned judgments. The influence of lawless force directed toward parties or witnesses to proceedings during their pendency is so sinister and undermining of the process of adjudication itself that no court should regard it with indifference or shelter it from exposure and inquiry. The remedies of the law are substitutes for violence, not supplements to violence, and it is proper that courts and administrative bodies so employ their discretion as to dispel any belief that use of dynamite will advance legal remedies.

Further delay in this case is to be regretted, particularly in view of the long delay that has already occurred. We set out in the footnote the facts in this regard, which we do not recite as any criticism of the Board, which in turn has suggested no criticism of the Company.[19]

---

[19] The complaint was served November 15, 1938 and the hearing set for November 28. A continuance was requested by the Company on the ground of illness of its attorney, but was refused. The Board presented its evidence in six days, the Company in three. The hearings

30

In view of the whole record the order of the court below is not arbitrary or unreasonable or an abuse of discretion. It is

*Affirmed.*

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY concur, dissenting.

A desire to punish dynamiters does not justify a failure to protect respondent's employees, innocent of wrongdoing, in their freedom either to bargain collectively through representatives of their own choosing or to be represented by no one at all. Without relying in the slightest degree on the evidence of persons convicted of or charged with dynamiting, the Board found the Association to be company-dominated. Its order gave no benefit to anyone even remotely suspected of complicity in the crimes charged. Instead it carefully eliminated such individuals, and the Union, from the scope of its award and gave no credence to the suspect witnesses. The sole issue for the courts to determine is whether there is, in the tes-

closed on December 9, 1938, and the Trial Examiner's intermediate report was filed on July 27, 1939—a little more than seven months later. The Company's exceptions were filed September 1, 1939, and the Board set them for hearing on November 9, 1939. The Board had not decided the case when, on February 19, 1940, the Company petitioned it for a rehearing with regard to the evidence of the depredations obtained by the arrest of all, and the confessions of some, of the participants, all occurring since February 1, 1940. Nine days later the Board decided the case. On December 13, 1940, the Board petitioned the court below for enforcement of its order, and the court rendered its decision on December 12, 1941. On February 19, 1942, after the time for filing a petition for rehearing had expired, the Board moved for leave to file it out of time. The court denied the motion, and on March 9, 1942, three days before the time to petition this Court for a writ for certiorari had expired, the Board asked and obtained an extension of time to April 11, 1942, in which to file its petition. The petition was filed on that date, granted on May 25, and argument in this Court was completed November 16, 1942.

timony of witnesses untainted by any suspicion, sufficient evidence to support the Board findings that the employer has (1) set up a company-dominated union contrary to § 8 (2) of the Act, and (2) interfered with, restrained and coerced its employees in exercising their right to belong to the union of their choice contrary to § 8 (1). The Board order, requiring disestablishment of the dominated union and cessation of interference, contemplates only that this Company shall not intimidate or coerce its employees—that it shall leave them free. This freedom is their legal right; and crime by some of them cannot justify the Company in destroying the freedom of all, or even a few of them. Under our government guilt is personal; it cannot, or at least should not, attaint the innocent; it cannot, or should not provide an excuse for one injured by it to invade the liberty of others. In short, the crimes of some of these employees, or of the non-employee members of a union, cannot have relevance to the two issues the Board decided.

I agree with the Court that alleged errors in the administration of the hearing by the trial examiner or by the Board officials are not properly before us. Such questions can be considered when the case is properly reviewed by the court below. Having agreed with the Court that this question is now irrelevant, I cannot join in discussing, as the Court does, the propriety of alleged statements to one Boyle, and reserve all opinion on this phase of the case.

If the evidence respondent asks to offer has any relevance whatever, it must be for one of two reasons: that (a) the Union's purposes in filing the complaint were not salutary and that the character of its activities was such that the Board might upon hearing the proffered evidence decline to exercise any jurisdiction to protect the rights of employees, even the innocent; or (b) that the Board's witnesses were of such character as to be unworthy of belief.

The first of these grounds surely has no real merit. There is of course no reason why a meritorious complaint should be dismissed merely because of the bad character of one who makes the charge. The ill character of a complainant, or of witnesses, provides no excuse for leaving the public interest unprotected. A witness can be impeached in a proper manner; but the opinion here seems to suggest that administrative agencies should hereafter spend a large part of their time in trying complainants instead of those charged with violating the law. Now, four years after this proceeding began, it is broadly hinted that the Board should permit the employer to try the informer and it is clearly implied that if the complaining union is proved evil, the employees should not be free of company-domination no matter how extreme it may be. If the practice here suggested is not soon repudiated, a new method will have been provided in which to paralyze administrative agencies by discursive delay.

As has been noted, the Board has carefully eliminated from its order all provisions which would specifically benefit the Union, and I see no reason for ordering it to take new evidence of the character of a union to which it has granted nothing at all. Despite this there is a premise, vaguely stated but nonetheless permeating the opinion of the Court, that evidence of the bad character of the Union would require the Board to take some other action; that somehow, as a practical matter, the Board, despite its careful effort to avoid such a result, has aided the Union which brought the charges. But if the desire be to punish the Union, I cannot agree that this should be done by compelling innocent employees to remain in a dominated Association. If the Board's order requiring the disestablishment of the Association is found to be supported by evidence, the employees may form a genuine independent union, they may join some other organization, or they

may choose to remain unorganized. A requirement that, for their own good, they must remain in a company-dominated union to avoid any possibility of their aiding the wrongdoers denies them the freedom of choice which the Act preserves. Whatever character the Union may be found to have, the Board's protection to respondent's employees should not be disturbed because of it.

The motion for permission to offer new evidence attacking the credibility of witnesses raises a different question—one going to the quality of evidence on which a conclusion is to be reached. The Board, after full consideration, denied the motion because it found that the proffered evidence even if true had no relation to the issue of Company coercion of its employees. Whether a case shall be reopened after the evidence is closed, is, in courts, ordinarily a matter of discretion. I think the Board's action in this proceeding can not be said to be an unfair exercise of discretion and that in any event it was correct in holding the evidence irrelevant to the limited issues it decided.

It must be remembered that the fundamental issue which the Board decided here is whether the Association is company-dominated. We are told that testimony concerning the misdeeds of the electrical workers are material to this conclusion because the Board relied on witnesses Marks, Freeman, and Guy; because the Board "must have relied" on other union witnesses; because the Board's decision may drive the employees into the offending Union; because an Association official was asked hypothetical questions about bombing; and because company witnesses might have been more credible if the full facts of violence had been known.

To support its view that the Board might have disbelieved certain of its witnesses had the full facts been known, the Court has gone not only to the testimony

which has been printed by the Board and the Company and offered by the Board as the basis of its case, but has searched evidence to which the Board has made no reference in its findings and which it has not offered as of any credibility at all. Evidently the Board is to be required to re-examine that evidence in which it has already, by rejection of it, expressed disbelief. I think no possible good can come from reconsidering evidence once rejected for the purpose of re-rejecting it.

The Board called sixteen Union witnesses. The three most under suspicion for dynamiting were Guy, Marks, and Freeman. Guy's testimony, as submitted by the Board in support of its finding, is that two company supervisors kept a Union meeting under surveillance, a fact conceded by the supervisors. Marks testified that the Company did not interfere with union organization, and Freeman testified that Holmes, president of the Association, was respected by his fellow employees. A more innocuous or colorless collection of evidence can scarcely be imagined. The testimony of six other Union witnesses, as reflected by the printed record, is equally trifling, while that of the other seven, which fills about four per cent of the printed record, was not relied on by the Board in its findings.

The ultimate Board holding before the Circuit Court of Appeals for review is that the Association was company-dominated. This holding rests almost exclusively on the testimony of Company witnesses or witnesses affiliated with the Association. There is not even a hint that these witnesses were intimidated or interfered with in any way, or that they told anything but the truth. If it be assumed that Guy, Freeman, and Marks are wholly unworthy of belief, this basic testimony given by Company witnesses would still be unaffected. The suggestion made by the Court, not raised by the Company either in its petition for rehearing to the Board or in its motion for remand in

the Circuit Court of Appeals, that examination into the dynamiting will reflect on the attitude of the employees toward the Union during the earlier organizational period, therefore misses the heart of the case. If the Company's supervisory representatives did organize and dominate the Association, the Association is company-dominated and the Board's order should be upheld, *I. A. of M.* v. *Labor Board,* 311 U. S. 72, 79, 80; if they did not, the Board's order should not be enforced. The character of organizers of a separate and distinct union contributes nothing to the issue of Company conduct.

The last suggestion as to the materiality of further investigation into the dynamiting is that for some reason the trial examiner asked Holmes questions concerning his view on violence in labor disputes. Holmes expressed a proper respect for law and order, and it is incredible that a new hearing would either cause him to alter his view in this regard or change the Board's respect for his conclusion.

It will not seem odd that so much of the evidence originally introduced by the Board was eventually deemed irrelevant to the final decision when it is realized that the original charge against the respondent was much broader than the final holding. This evidence, directed to the support of these peripheral charges, lost all consequence for this case when the Board declined to believe the charges themselves. For example, the original complaint alleged that one Elkins was wrongfully discharged. Since both the trial examiner and the Board found the charge unsupported, Elkins' testimony in this respect and all that supports it drops completely from the case. The opinion of the Court appears to require re-assessment of such surplus testimony offered in behalf of charges concluded to be unfounded.

Of course no Court should shelter dynamiters from exposure and inquiry. But compelling the Board to digress

from the adjudication of a labor dispute in which such dynamiting has no part into a pursuit of the guilty, punishes the innocent employees of respondent rather than the evildoers themselves. The Labor Board is no fair substitute for a grand jury or a criminal court.

If the Board had denied respondents an opportunity to offer newly discovered evidence which tended to show that witnesses to material facts relied on by the Board had since the hearing been convicted of serious crimes affecting their credibility, I would not object to sending the matter back to the Board. But analysis of the record demonstrates that no such thing occurred. I think we should send the case back to the Circuit Court of Appeals for the normal review procedure.