**UNION STARCH & REFINING CO. v. NATIONAL LABOR RELATIONS BOARD.**

**NATIONAL LABOR RELATIONS BOARD v. AMERICAN FEDERATION OF GRAIN MILLERS, LOCAL NO. 153, A. F. OF L.**

Nos. 10144, 10161.

United States Court of Appeals Seventh Circuit.

Feb. 2, 1951.

George P. Ryan, Robert D. Risch, Indianapolis, Ind., (Ross, McCord, Ice & Miller, Indianapolis, Ind., of counsel), for Union Starch.

Luther Ely Smith, Jr., Victor B. Harris, Smith, Harris & Hanke, St. Louis, Mo. for Am. Fed. of Grain Millers.

A. Norman Somers, Bernard Dunau, George J. Bott, General Counsel, David P. Findling, Associate General Counsel, Duane Beeson, all of Washington, D. C., for National Labor Relations Board.

Louis S. Belkin, Akron, Ohio, for International Chemical Workers Union.

Before MAJOR, Chief Judge, and KERNER and FINNEGAN, Circuit Judges.

KERNER, Circuit Judge.

On October 11, 1948, the Regional Director for the National Labor Relations Board issued and filed a complaint against Union Starch and Refining Co. (hereinafter called the Company), a corporation engaged in interstate commerce, maintaining and operating a manufacturing plant at Granite City, Illinois, where it processes corn food products. The complaint was based on an amended charge filed with the Board by John Ralph. It charged that the

Company had committed unfair labor practices within the meaning of §§ 8(a) (1) and 8(a) (3) of the National Labor Relations Act as amended by the Labor Management Relations Act, 1947, 29 U.S.C.A. § 158 (a) (1, 3) and (b) (2). A similar complaint was issued against Grain Processors Independent Union, Local No. 1 (the Union changed its name to American Federation of Grain Millers, Local 153 AFL, and will hereinafter be designated as the Union), alleging that the Union had engaged in unfair labor practices within the meaning of §§ 8(b) (1) (A) and 8(b) (2).

The principal question involved is whether employees who request union membership and tender initiation fees and dues, but fail to comply with other union-imposed conditions for acquisition of membership, are protected by the Act from discharge under the terms of a valid union security agreement.

There is no dispute as to the facts. On April 2, 1948 the Company and the Union executed a collective bargaining or union security contract which required as a condition of employment, membership in the Union within thirty days from the date of the contract or from the date of employment, whichever was later. April 5 the Company posted on its bulletin boards a notice whereby the employees were advised of the execution of the contract and its provisions. April 28 John Ralph, Nellie Ralph, his wife, and Mary Rawlings called at the office of the Union where they talked with one Bloodworth, the Union's business agent. Bloodworth informed them that in order to join the Union it was necessary to pay dues and an initiation fee, file an application card, attend the next meeting of the Union, on May 6, and take an oath of loyalty to the Union. The Ralphs and Rawlings tendered the proper amount of the initiation fee and dues which Bloodworth refused to accept until they had been voted upon and had taken the obligation of membership. Ralph told Bloodworth that he did not care whether Bloodworth made out applications for him and his wife but that they would never take an oath, and when Bloodworth made it clear that the oath was a condition precedent to union membership, the Ralphs left without further conversation.

The Ralphs and Rawlings failed to attend the union meeting on May 6 or any other meeting. Rawlings did not attend the meeting on May 6 because her husband had broken his finger and needed care. She was willing to take the union oath, although she was uncertain as to whether she should do so in view of her membership in another AFL union. She wanted time to obtain advice on the matter, and had no objection to attending a union meeting in order to have her application voted on. Her application, however, was submitted to the Union and she was accepted as a member.

On May 7, without reference to the failure to attend the meeting, the Union informed the Company by letter that the Ralphs and Mary Rawlings had failed to pay initiation fees and dues as required by the union shop clause of the collective bargaining agreement, and demanded their discharge. Thereupon the Company undertook an investigation to determine whether union membership was available to the Ralphs and Rawlings on the same terms and conditions generally applicable to other members. The Company's personnel director met with the employees in question. He showed to each employee the Union's demand for discharge and asked each employee to make a signed statement of his position on the matter. The employees complied with the request, and in their declarations stated that they had tendered their initiation fees and dues to the Union on April 28, but that the tender was rejected on the ground that they had not fulfilled other union-imposed conditions of membership.

On May 12 the Company received another letter from the Union in which it was stated that the Union uniformly required all applicants for membership to attend a regular union meeting for the purpose of having their applications voted on. In the letter the Union requested the discharge of the employees who had failed to comply with this condition of membership, and the Company was threatened with a work stoppage unless it acceded to the Union's demand. Thereupon the Company again called

in the employees who were not union members and handed each of them a written questionnaire in which each employee was asked (1) whether he was willing to tender the periodic dues and the initiation fee; (2) whether he was willing to take the obligation as a member of the Union; and (3) whether he would attend the regular union meeting at which his application for membership would be voted upon, which were conditions uniformly required by the Union of applicants for membership. All the employees returned the questionnaire answering the three propositions "yes" except the Ralphs and Rawlings. The Ralphs and Rawlings were discharged on May 13, 1948 because they were non-members of the Union, not on the ground that they had not tendered dues and initiation fees, but because they had failed to file an application card, attend a meeting of and take an oath of loyalty to the Union.

Section 8(a) (3) forbids an employer by discrimination in regard to hire or tenure of employment to encourage or discourage membership in any labor organization, but that section permits the employer to make an agreement which may require as a condition of employment "membership" in the contracting labor organization. The making of such an agreement, however, is circumscribed by provisos (A) and (B) of that section which provide: "* * * no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;"

And § 8(b) (2) makes it an unfair labor practice for a labor organization—"to cause or attempt to cause an employer to discriminate against an employee * * * with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;"

A majority of the Board was of the opinion that the provisos spell out two separate and distinct limitations on the use of the type of union security agreements permitted by the Act; that proviso (A) protects from discharge for nonmembership in the contracting union any employee to whom membership was not available for some discriminatory reason, and that proviso (B) protects the employee who tenders the requisite amount of dues and initiation fee and is denied membership for any other reason, even though that reason be nondiscriminatory. It concluded that if a union "imposes any other qualifications and conditions for membership with which he is unwilling to comply, such an employee may not be entitled to membership, but he is entitled to keep his job." And the Board found that the Company had discharged employees John Ralph, Nellie Ralph and Mary Rawlings in violation of § 8(a) (3), and that the Union caused the Company to discriminate against the employees in violation of § 8(b) (2) of the amended Act. In addition, the Board found that by causing the Company discriminatorily to discharge the employees, through the illegal application of its contract, the Union restrained and coerced the employees in the exercise of the rights guaranteed by § 7 of the Act, and thereby also violated § 8(b) (1) (A) of the amended Act. The Board ordered that the employees be reinstated, and since both the Company and the Union were responsible for the discrimination suffered by the employees, it ordered the Company and the Union jointly and severally to make the employees whole for any loss of pay they may have suffered. 87 N.L.R.B. 187. It is this order that the Company desires vacated and set aside; and the Board prays that the order be enforced.

The Union contends that it had the right to prescribe nondiscriminatory terms and conditions for acquiring membership in addition to that of tendering dues and initiation fees. The Company and the Union insist that since all employees were required

to file an application, attend the first meeting, be voted on, and take the obligation of membership, membership in the Union was available to the discharged employees on the same terms and conditions applicable to other employees. They argue that as long as the conditions imposed by a union for acquisition of membership apply equally to all employees, a union may, pursuant to a union security agreement, require the discharge of any employee who fails to meet any of the conditions the union may prescribe.

We agree that the Union had the right, under the statute here involved, to prescribe nondiscriminatory terms and conditions for acquiring membership in the Union, but we are unable to agree that it may adopt a rule that requires the discharge of an employee for reasons other than the failure of the employee to tender the periodic dues and initiation fees. We think the Board construed the statute in a reasonable manner and gave effect to all its provisions, and that its interpretation was in harmony with the purpose of Congress to prevent utilization of union security agreements except to compel payment of dues and initiation fees, and that the Board was justified in its conclusions. Compare Colgate-Palmolive-Peet Co. v. National Labor Relations Board, 338 U.S. 355, 70 S.Ct. 166.

If resort to legislative history is had, the statements of those who supported the legislation and secured its passage will be accepted in determining its meaning. We have considered such statements, and to us it is clear that proviso (B) forbids "any discrimination against an employee for nonmembership in a labor organization" if "membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership". On the floor of the Senate, in a colloquy between Senators Taft and Ball, and Senator Pepper, who opposed the Act (93 Cong.Rec. 4272),[1] Senator Taft said: "The union could refuse the man admission to the union * * * but if he were willing to enter the union and pay the same dues as other members of the union, he could not be fired from his job because the union refused to take him." The history of the Act in the House is equally clear in establishing that proviso (B) governs the acquisition of membership. The House bill, after describing permissible union security arrangements, stated " * * that no such provision may have the effect of denying employment or continued employment to any individual who on or before the time required tenders to the organization the initiation fees and dues regularly imposed as a condition of membership therein and to whom, in spite of such tender, membership therein was denied, or of denying employment or continued em-

---

1. "Mr. Pepper. * * * In discussion yesterday between the Senator from Ohio [Taft] and myself * * * dealing with the closed shop or the union shop, the Senator from Ohio stated * * * that if a union claimed the advantage or status of a closed shop or union shop, it would have to have what the Senator called democracy in respect to the admission of members. I understood the Senator to say that that would mean that anyone who presented himself and was qualified in other respects for membership, and who complied with the usual conditions for membership, such as the payment of dues, and so forth, would be entitled to membership.
*   *   *   *   *   *   *
"Mr. Taft. I did not say that. The union could refuse membership; but if the man were an employee of the company with which the union was dealing, the union could not demand that the company fire him. The union could refuse the man admission to the union, or expel him from the union; but if he were willing to enter the union and pay the same dues as other members of the union, he could not be fired from his job because the union refused to take him.
*   *   *   *   *   *
"Mr. Pepper. And the union can admit to membership anyone it wishes to admit, and decline to admit anyone it does not wish to accept.
"Mr. Ball. That is correct. But the union cannot by declining membership for any other reason than nonpayment of dues, thereby deprive the individual concerned of the right to continue in his job. In other words, it cannot force the employer to discharge him."

ployment to an individual who has been suspended or expelled from the organization on some ground other than nonpayment of regular dues." [2] See also committee report accompanying the House bill[3] in which it is said: "In brief, a union may deny membership to an employee upon any ground it wishes, but the only ground on which it can have him discharged under a union security clause is nonpayment of dues and initiation fees." The House Conference Report[4] noted no difference in the import of the language used in the Senate Bill. It stated, " * * * conference agreement adopts the language of the Senate amendment," and observed that this protects "the individual worker against arbitrary action by the union" in that, among other things, discrimination is forbidden if "membership is denied or terminated for reasons other than failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.

We now consider the contention that the proceedings before the Board were invalid because, it is claimed, the complaints were based on charges not properly sworn to. The argument is that the charges were executed in violation of § 203.11 of the Board's Rules and Regulations which provides that the charge shall be in writing and sworn to before a person authorized by law to administer oaths, or shall contain a declaration, under the penalties of the Criminal Code, that its contents are true.

It is undisputed that at the time Ralph signed the amended charges he stated to the Board agent that "it was against my religious obligation to swear or affirm, but it was 'Yea, Yea'." Ralph solemnized his signature with the Biblical reference to St. Matthew, Chapter 5, verses 34, 35, 36, and 37, and the Board agent signed the jurat. Thus Ralph made an affirmative declaration as to the truth of the contents of the amended charge.

■■ Section 10(b) of the Act requires the filing of a charge before the Board

may proceed in an unfair labor practice case, but there is no requirement that it be signed or sworn to. And it has been said that the purpose of the rule just quoted is to apprise the Board of the nature of the unfair labor practices alleged so as to enable it to determine that the charges are substantial and not frivolous, Consumers Power Co. v. National Labor Relations Board, 6 Cir., 113 F.2d 38, 42, and that the role of the charge is merely to set in motion the machinery of an inquiry, National Labor Relations Board v. Indiana & Michigan Electric Co., 318 U.S. 9, 18, 63 S.Ct. 394, 87 L.Ed. 579. It is addressed to the Board for the purpose of acquainting it with sufficient facts to enable it to intelligently direct its investigation. The Board decided that Ralph's reference to the Bible upon signing the amended charges, and his explanation that his religious convictions were opposed to an oath were equivalent to an oath. The Board was satisfied with this procedure. We do not understand that the Company or the Union was in any way misled or prejudiced by this procedure. In this situation we see no merit in the contention. Compare National Labor Relations Board v. Popper, 3 Cir., 113 F.2d 602, 603. In any event, even if the Board erroneously construed its rules, the error was harmless. It did not affect the substantial rights of the Company or the Union, and should therefore be disregarded. See § 10(e) of the Administrative Procedure Act, 60 Stat. 243, 5 U.S.C.A. § 1009 (e).

Finally it is contended that the Board exceeded its authority in issuing an order which required that the Company and the Union "jointly and severally" make whole the discharged employees for any loss of pay suffered because of their discriminatory discharges.

The Board's order was issued under the broad remedial language of § 10(c) of the Act as amended, 29 U.S.C.A. § 160(c), which provides that upon finding an unfair labor practice, the Board shall issue a cease

---

2. H.R. 3020, 80th Cong., 1st Sess., in 1 Legislative History of the Labor Management Relations Act, 1947 (Gov. Print. Off., 1948) 57–58, 184–185.

3. H.R.Rep.No.245, 80th Cong., 1st Sess., 32.

4. H.Conf.Rep.No.510, 80th Cong., 1st Sess., 41.

and desist order requiring the guilty party "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter: *Provided,* That where an order directs reinstatement of an employee, back pay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him * * *."

We have been told that the remedial powers given the Board by this section were fashioned for the "Attainment of a great national policy through expert administration in collaboration with limited judicial review [and] must not be confined within narrow canons for equitable relief deemed suitable by chancellors in ordinary private controversies." Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 188, 61 S.Ct. 845, 850, 85 L. Ed. 1271. Accordingly, it is uniformly recognized that the variable pattern of discriminatory practices revealed in cases before the Board requires a correspondingly variable set of remedial orders, if the Board is to fulfill its duty of taking appropriate steps to dissipate the effects of unfair labor practices, Virginia Electric & Power Co. v. National Labor Relations Board, 319 U.S. 533, 63 S.Ct. 1214, 87 L. Ed. 1568. Nevertheless, the Company makes the point that although the Company and the Union may both be responsible for the unlawful discharge, the amended § 10 (c) contemplates "that either one or the other would be responsible for the back pay, but not both."

We disagree. The word "or" has no such function. It is well established that the conjunctive and disjunctive are signified interchangeably by the use of "or" "if to do so is consistent with the legislative intent." See Sutherland, Statutory Construction, Vol. 2, p. 451 (3rd ed. 1943), and Carter v. McClaughry, 183 U.S. 365, 392, 22 S.Ct. 181, 46 L.Ed. 236; United States v. Fisk, 3 Wall. 445, 70 U.S. 445, 447, 18 L.Ed. 243; In re Gayle, 5 Cir., 136 F.2d 973, 976; Thompson v. Commonwealth Life Ins. Co., 198 Miss. 515, 23 So. 2d 539, 540; Parks v. West, Tex.Civ.App., 108 S.W. 466, 471. Congress manifested no intent to restrict the remedial powers of the Board to a compulsory choice between the parties responsible for the discrimination suffered by the discharged employees. On the contrary, we think the amended section correlates the remedial parts of the Act with those substantive provisions of the amendments, and must be construed to permit the Board to hold an employer and a union jointly and severally liable for back pay where it finds them both responsible for the loss suffered by the discharged employees.

We are fortified in our conclusion that Congress did not intend to restrict the remedial powers of the Board to a compulsory choice between the employer and the labor organization by a brief examination of the legislative history of § 10(c). It shows a determination to maintain the full scope of administrative discretion that had been established in fitting remedies to violations. Thus, a provision in the House bill[5] which would have restricted a Board order to the relief asked for in the complaint was not accepted by the Conference Report.[6] In a similar vein, a provision in the House bill specifying a particular remedy in non-back-pay cases and thereby implying a restriction of the Board to that remedy, was deleted by the Conferees, who declared that Congress should not "by implication, limit * * * the Board in its choice of remedial orders.[7] The Conferees instead adopted the language of the Senate amendment which expressly preserved the broad wording of the original Act authorizing the Board "to take such affirmative action as will effectuate the policies of this Act," and which also contained the reference to union liability for back pay, as it now reads.[8] Thus it is apparent that " * * *

---

5. H.R. 3020, 80th Cong., 1st Sess., in 1 Leg.His. 68, 195.

6. H.Conf.Rep.No.510, 80th Cong., 1st Sess., 54.

7. H.Conf.Rep.No.510, 80th Cong., 1st Sess. 54.

8. Sen.Rep.No.105, 80th Cong., 1st Sess., 39. See H.Conf.Rep.No.510, 80th Cong., 1st Sess., 13.

Congress intended Section 10(c) to *extend* the power of the Board so as to provide it with a means to remedy the union unfair labor practices newly established by the Labor Management Relations Act, comparable to the means it already had to remedy the employer unfair labor practices established by the National Labor Relations Act." H. N. Newman, 85 N.L.R.B. 725, 732.

Other questions are raised in the briefs including the Company's contention that the order holding the Company jointly and severally liable for back pay constituted an abuse of its discretion. To discuss the points urged would unduly lengthen this opinion. It will be enough to say that we have considered all the questions raised, and find them without merit.

The petition to set aside the order will be denied and a decree for the enforcement of the order will be entered. It is so ordered.