**RELIANCE INSURANCE COMPANIES,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD,** Respondent.

No. 19566.

United States Court of Appeals
Eighth Circuit.

Sept. 4, 1969.

Byron J. Beck of Morrison, Hecker, Cozad, Morrison & Curtis, Kansas City, Mo., for petitioner.

Robert A. Giannasi, Atty., National Labor Relations Board, Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Warren M. Davison, Atty., N.L.R.B., on the brief.

Before MATTHES, GIBSON and BRIGHT, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

Petitioner, Reliance Insurance Companies, seeks to review and to set aside an order of the National Labor Relations Board entered on December 3, 1968 against Reliance, reported at 173 NLRB 161, finding Reliance in violation of §§ 8 (a)(3) and 8(a)(1) of the Labor Management Relations Act, as amended, 29 U.S.C. § 151 (1965) et seq. The Board files a cross-application for enforcement of its order.

The Trial Examiner found that the General Counsel had failed to establish by the preponderance of the evidence the unfair labor practice charges set forth in the complaint and recommended that the complaint be dismissed in its entirety, but the Board in a 2–1 decision found that Reliance had violated §§ 8(a)(3) and 8(a)(1) of the Act by failing to give nondiscriminatory consideration to the application of Robert L. Thomas for employment and § 8(a)(1) of the Act by interrogating Thomas concerning his interest and activity in the Union (American Claims Union, the complainant).[1]

The broad question raised on appeal is whether there is substantial evidence on the whole record to support the Board's findings. Two distinct issues are presented: (1) whether Reliance's questioning of Thomas about his union activity violates § 8(a)(1) of the Act; and (2) whether Reliance discriminated against Thomas with regard to his application for employment in violation of §§ 8(a)(3) and 8(a)(1) of the Act. A

---

1. Simultaneous complaints were filed by the American Claims Union on behalf of Thomas on July 3, 1967 against the Reliance Insurance Companies and American Mutual Liability Insurance Company. These cases were consolidated for hearing, by order of the Regional Director. The charges were identical against each company. The Trial Examiner found no unfair labor practice charge sustainable against either company and recommended dismissal of the complaint in its entirety. The Board and exceptions of the General Counsel and cross-exceptions of Reliance assigned the matter for hearing to a three-member panel, pursuant to § 3(b) of the Act.

resolution of these issues necessarily involves a comprehensive review of the evidence.

The undisputed evidence shows that Reliance, operating nationwide, had an opening in its Kansas City office on May 1, 1967 for a claims adjuster. Reliance unsuccessfully attempted to fill this position by transferring Robert Davidson, a claims employee with 13 years experience, from Grand Island, Nebraska to Kansas City. On May 31,[2] Davidson declined the opportunity to transfer. In the interim, on or about May 10, Jack Miller applied for the job. He was told that Reliance would keep his application but would take no action until negotiations with Davidson were concluded. Previously, under date of November 16, 1966, John Folk, vice president in charge of claims, sent a notice to all district claims offices stating (1) he wanted to know about all personnel matters, including proposed hirings, and (2) he would be sending "a profile to follow in recruiting applicants for positions in the Claims Department," and requesting that the offices in the interim advise him about any vacancies so that "This will give us an opportunity to make any suggestions before you commit yourself to any prospective employee. * * * [T]hese instructions apply to all technical claims employees * * * [but not] to clerical employees * * *." In line with the above letter, Reliance established the policy of obtaining claims adjusters with at least three years experience in the claims field or else obtaining novices with no experience and starting them out as trainees; college graduates were desired if available.

On June 5, John Travers, claims manager for the Reliance office in Kansas City, Missouri, wrote to Folk of his intention to fill the vacancy with a man possessing a minimum of three years experience in line with Folk's requirement for new claims adjusters, which individual would be passed upon by Folk, and if no such applicant were secured the trainee route would be pursued. This procedure was followed by the Kansas City office in hiring Robert Therlin on June 22.

On June 26, Robert L. Thomas who had 2½ years claims experience with the Hartford Insurance Group in Kansas City applied for the opening with Reliance. Thomas had resigned from Hartford in May. Previous to his resignation he was actively involved in an unsuccessful union organizational attempt at Hartford. (The Union lost the representational election held on February 27.) He worked for a short period as a book salesman and in June sought to return to the adjustment field and obtain a position as a claims adjuster. Before applying to Reliance, Thomas consulted with Gary Widmer, president of the American Claims Union, who promised to call Travers and inform him that Thomas was not a rabble-rouser or troublemaker.

At the interview of June 26, Thomas presented a resume of his background and when Travers mentioned that he knew Joe Shramek, the regional claims manager of the Hartford Insurance Group, and that he was a friend of his, Thomas's response and Travers' questioning, according to Thomas, was:

"* * * I shook my head and smiled. He [Travers] said, 'Have you had any problems with Hartford or Mr. Shramek?' I said, 'Well Mr. Travers, you know as well as I do we had a union election at Hartford and other than the union I had no problem with Mr. Shramek or the company.'"

The interview continued with Travers stating they had a new company policy for hiring men but Travers could not find the letter setting forth the policy. Travers then asked Thomas, "Are you still active in the union, Bob?" Thomas answered he was not necessarily pro-union but he was very active with the Union while at Hartford. At this point the conversation was interrupted by a telephone call from Widmer, who asked

---

2. All reference to dates are for 1967 unless otherwise stated.

Travers to consider Thomas on his merits, which Travers said he would do.[3]

At the conclusion of Widmer's call the interview continued, according to Thomas, as follows:

"I asked 'Was that Gary?' He said, 'Yes.' Mr. Travers then said, 'Well, Bob, unions, I'm very interested in unions and I'm not really against them myself, but as I said before, we've got a new company policy and the man above me, he might not like your being a member.' I said, 'Well, Mr. Travers, I would do a good job for you, to the best of my ability, and I'm not here to cause any trouble.' Mr. Travers then said, 'Well, we'll put your name in the hopper along with the rest of the men.' and he gave me an application to fill out and I told him I would return it as soon as possible."

Thomas took the application form and returned it two or three days later, June 28 or 29 (the record is not clear on the precise date), at which time he had a second interview with Travers. At this time Thomas expressed the view that Travers should have the authority to act on his application without consulting the home office and volunteered the statement, "Well, Mr. Travers, I realize you have to be careful of me because of my union activity." to which Travers replied, "Well, yes, I do." Travers testified he accepted the application and said, "Fine, as I told you in my first interview, I have just started to find a man and I will let you know in due course." Additional brief conversation ensued; Thomas shook hands with Travers and left. Thomas then apparently contacted Widmer and on the following Monday, July 3, the American Claims Union on behalf of Thomas filed the unfair labor practice charges against Reliance and the American Mutual Liability Insurance Company.

Several applicants for the position were interviewed by Reliance both before and after the charge was filed. On July 6 or 7, Jack Miller again contacted Reliance to say he was still available for the position. On July 12, Folk sent a memorandum to Travers in which he inquired as to the status of the attempt to fill the job vacancy. On July 13, Travers sent the applications of Thomas and Miller, but none of the other applications, to Folk. Travers said nothing about the Thomas application but recommended the hiring of Miller on the basis of his experience and qualifications for the job. On July 14, Folk approved the hiring of Miller, who was hired officially on July 24.

On July 13, a discussion ensued at a luncheon meeting of the Kansas City Claims Managers' Council about the unfair labor practice charges filed by Thomas against three insurance companies. Conflicting versions of what transpired appear in the record. One witness, Louis Haverland, an alternate member of the Council, testified that Travers said he used the ruse of having to get the application approved by the home office in order to get rid of Thomas. Travers denied making this statement and Travers' version was supported by three other claims men who were present at the meeting.

COERCIVE INTERROGATION
ISSUE—8(a)(1)

During the first interview Travers asked Thomas, "Are you still active in the union, Bob?" to which Thomas replied, "I'm not necessarily pro-union. I was very active with the union while I was with Hartford." This question according to the Board constitutes a violation of § 8(a)(1)—coercive interrogation concerning protected activity under the Act. According to the Board the question had no legitimate purpose and had a "natural tendency to instill in the minds of employees fear of discrimination on the basis of the information [sought]." N. L. R. B. v. West Coast Casket Co., Inc., 205 F.2d 902, 904 (9 Cir.

---

3. According to Thomas's testimony, in his previous conversation with Widmer, Widmer said, "I think it will help you get a job if I tell him we are not putting you there as a plant or a rabblerouser and I will talk to him a little bit."

1953). The Board points out there was no issue of a union majority which might legitimize such inquiry under § 8(c) and noted that Thomas was not assured his answer would not penalize him.

We think the Board has placed undue significance on this innocuous question and the response it invoked. The question in context shows no union animus [4] and cannot be considered coercive even under a strained construction of the evidence. In the first place, Travers or Reliance of their own volition expressed little interest in the union activities of Thomas. The questions and responses were normal in light of Thomas's remarks. Thomas continually volunteered information regarding his union activities to the exclusion of more pertinent information requested by Travers.[5] For example, when asked whether he had "any problems with Hartford or Mr. Shramek?" Thomas volunteered that he had been involved in a union election at Hartford. There is no proof that Thomas's union activities caused him any trouble at Hartford and in fact the more appropriate and correct response on his part would have been to mention that he had been suspended in March 1967 for getting involved in an altercation with another Hartford agent in St. Joseph, Missouri. Also, Thomas had already met with Gary Widmer, the president of the American Claims Union, and had Widmer call Travers in Thomas's behalf.

These are not the actions of a man easily coerced, but rather of a man perhaps flaunting his predilection for unionism. Thus the Board's suggestion that Thomas's response to Travers' question was evasive, indicating the question had a coercive effect, is not warranted. Not only was Thomas a man not easily coerced, but viewed in the light of Thom-as's revelations about his union activity, it is difficult to believe that Travers thought he could successfully coerce or threaten Thomas merely by asking if he were still active in the union. Furthermore, it is difficult to see what end could be accomplished through such inferred coercion. Travers had ample opportunity to prevent the employment of Thomas without attempting to force him to abandon his union merely by telling him he did not meet the desired qualifications of Reliance.

The question asked by Travers is much more reasonably viewed as mere conversation in response to Thomas's revelation about his union activities. We cannot ignore the complete isolation of this allegedly improper question; nor can we ignore the assurances given by Travers to Widmer and to Thomas that Thomas's application would be considered on the merits along with all other applications, or the statement by Travers that he himself was not against unions. The interrogation, if it can be called such, and the response to statements made by Thomas were innocuous, invited, and certainly cannot within the context of this case be considered as threatening, intimidating or coercive. N. L. R. B. v. Arkansas Grain Corp., 392 F.2d 161 (8 Cir. 1968). As noted in N. L. R. B. v. Ralph Printing and Lithographing Co., 379 F.2d 687, 690 (8 Cir. 1967), "An employer's interrogation of its employees, however, is not unlawful per se, unless conducted with such anti union animus as to be coercive in nature."

The case of N. L. R. B. v. Harry Berggren & Sons, Inc., 406 F.2d 239 (8 Cir. 1969) relied on by the Board is inapposite since it is concerned with the imposition of adequate safeguards incident to a systematic polling of the employees during an election campaign. In the in-

---

4. The phrase "anti-union animus" is often used in the cases to mean an inclination or feeling against unions. One of the modern dictionary definitions of "animus" is ill will, antagonism, hostility or animosity and we use the phrase "union animus" to connote a negative feeling or hostility toward unions.

5. It is anomalous that Thomas concealed his union sentiments and activities on other job interviews, but was aggressive and outspoken in conveying them to Travers.

stant case we are concerned with only an isolated and casual question of a normal nature asked in an employment interview and the responses made to it.

■■ It is appropriate to note that the Board's findings are in opposition to those of the Trial Examiner who heard and had the opportunity to evaluate the demeanor of the witnesses, and where such a disagreement occurs, the substantiality of the evidence relied on by the Board is necessarily affected. While the Board is not bound by the Examiner's findings, neither is this Court bound by the Board's rejection of an Examiner's findings. The Supreme Court in Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456 (1951) discussed the weight to be given the Examiner's findings:

"We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony."

The fact that the Board's decision is not unanimous would also, it appears to us, be an added factor to recognize in considering the weight to be given to the Board's findings. We do not find substantial evidence in the record to support this finding.

## DISCRIMINATION ISSUE UNDER §§ 8(a)(3) and (1)

■■ The Board found that Reliance violated §§ 8(a)(3) and (1) of the Act by failing to give nondiscriminatory consideration to Thomas's application for employment because of his union views or activity. Charges of discrimination are difficult to resolve even in discharge cases where there is a greater quantum of evidence available on the activity of both the employer and the employee than in a hiring case. As Judge Blackmun noted in N. L. R. B. v. Byrds Manufacturing Corp., 324 F.2d 329, 332–33 (8 Cir. 1963): "These discharge issues are difficult and sensitive when termination coincides with union activity." Here, however, we have no termination, only a failure to hire. An employer has the right, absent a contract, to pick and choose his employees and hire those he thinks will best serve his business interests. However, an employer cannot discriminate against an applicant because of his membership in a union or his views on protected activity under the Act. An applicant is thus treated as an employee within the meaning of § 2(3) of the Act defining an employee, Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 191–93, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), and § 8(a)(3) proscribes "discrimination in regard to hire."

In viewing the issue of discrimination in the hiring process, the same principles would apply as in the discharge cases though these principles may be more difficult to apply because of the limited relevant factual background. The appellate courts have expressed themselves in various ways in approaching the discrimination issue. We have held that an otherwise justifiable ground for discharge is unlawful if pretextual and not the moving cause. Marshfield Steel Co. v. N. L. R. B., 324 F.2d 333 (8 Cir. 1963). We have held discharge unlawful if one purpose were to interfere with union activity, Kansas City Power & Light Co. v. N. L. R. B., 111 F.2d 340 (8 Cir. 1940); or if it were a contributing cause in the discharge, Cupples Co. Manufacturers v. N. L. R. B., 106 F.2d 100 (8 Cir. 1939); or if it were motivated in any degree by union activities. Farmbest, Inc. v. N. L. R. B., 370 F.2d 1015 (8 Cir. 1967).

■■ The Board properly points out that a reviewing court may not "displace the Board's choice between two fairly

conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). Here, however, the evidence on the record as a whole does not rise to the dignity of two conflicting views as there is no substantial evidence to justify the Board's finding that Thomas's application was unsuccessful due to his past union activities or views. The Board neglects to consider the unimpeached and uncontradicted evidence in the record and seeks to support its findings by speculative inferences from evidence discredited by the Trial Examiner and inferences that are contrary to the undisputed record.

The Board in its brief makes the rather strange contention that the relative merits of the applicants for employment are immaterial and contends that the violation here occurred when Thomas's application was acted upon in a discriminatory fashion. Since the unfair labor practice charge was filed two or three working days following the day the application was filed (the application being filed on a Wednesday or Thursday and the charge being filed on the following Monday), Reliance did not even have an opportunity to act upon the application. In the ordinary course of business in considering the relative merits of the applicants, which Reliance certainly had a right to do, it would not and should not be called upon under the law to make a decision until it decides to do so, barring discriminatory procrastination. The Board is not authorized to tell a company when and how to hire an employee.

 It is correct, as contended by the Board, that the mere existence of a valid ground for not hiring a person would not be a defense to an unfair labor practice charge under the Act if the refusal to hire is actually for a proscribed reason. N. L. R. B. v. Superior Sales, Inc., 366 F.2d 229 (8 Cir. 1966). But the right to hire and fire is still essentially a prerogative of management. "The Act proscribes the exercise of the right to hire and fire only when it is employed as a discriminatory device." N. L. R. B. v. Audio Industries, Inc., 313 F.2d 858, 861 (7 Cir. 1963). Thus where management can point to sound business reasons for its failure to hire an individual, the Board must prove that these reasons were not the motivating basis for rejection of an application for employment or they were, even if sufficient, pretextual. Cf. Mitchell v. Goodyear Tire & Rubber Co., 278 F.2d 562 (8 Cir. 1960).

It is clear in the present case that Reliance had good business reasons for hiring Miller and rejecting Thomas. The evidence is uncontroverted that Reliance had adopted a policy requiring three years experience of all newly hired claims adjusters. Thomas had only 2½ years experience. Miller had 3½ years experience as a claims adjuster plus one year of law school. Thomas was not forthright in disclosing his suspension while with Hartford and was obviously more concerned with interjecting his union proclivities into the picture than in truthfully answering the question posed to him as to whether he had had any problems with Hartford. Furthermore, neither the applicant nor the Board could even wait for Thomas's application to be considered. Thomas apparently attempted to force his immediate employment by causing the unfair labor practice charge to be filed a few days after submitting his application or else he wanted to lay the groundwork for unfair labor practice charges to be filed for his personal benefit.[6]

The Board found that Travers merely went through the motions of interviewing Thomas and had no intention of hiring him due to his past union involve-

---

6. General Counsel's witness Douglas Baker, characterized by the Board as a disinterested witness, testified that Thomas made a statement to him in connection with the unfair labor practice charges to the effect that he would rather sit back and see how the charges came out because he would rather live off three companies than work for one on a salary basis.

ment. But the record is clear that Travers sat through two full interviews with Thomas, requested Thomas to fill out an application, told Thomas his application would be considered with the others, and spoke with Gary Widmer and assured him Thomas would be considered on the merits. Travers' of his own volition, called Joe Shramek for further information regarding Thomas's qualifications, and finally sent Thomas's application to Folk. Perhaps the only thing Reliance failed to do, was to hire Thomas, and for this they had good business reasons. .

The Board attempts to find union animus in Travers' response "Yes, I do" to Thomas's statement that Travers had to be careful about him due to his union activity. But, as the Trial Examiner pointed out, Travers' response could well have indicated a concern about unprotected activity on Thomas's part which could have affected his suitability for the job. The Board finds union animus in Travers' statement that Folk might not like his being a union member. But this statement was entirely speculative on Travers' part and no proof was offered to indicate union animus on the part of Folk. This does not constitute substantial evidence in any sense of that concept, but is pure conjecture.

The crucial evidence on this issue rests on alleged statements made by Travers at a luncheon meeting of the Kansas City Claims Managers' Council on July 13. The Board contends that Louis Haverland's testimony regarding Travers' statements at the Claims Managers' meeting substantiates its finding that the failure to hire Thomas was discriminatory. Haverland's testimony was not only uncorroboated, but was contradicted by three other participants in the meeting, denied by Travers, and was on the record incorrect in significant aspects; in addition, it was not credited by the Trial Examiner. Substantiality demands more than suspicion and discredited testimony of this type.[7] Approximately 28 other people were present at this meeting, yet the General Counsel, who carried the burden of proof, failed to corroborate Haverland's testimony. Since most of Haverland's statements are patently incorrect, there is little left on which to carry the issue. Haverland's testimony that Travers said he had used the "ruse" of having to get the application approved by the home office to get rid of Thomas is contrary to the undisputed fact that this procedure was followed with all applicants and had been standard operating procedure for some months before Thomas ever came into the picture.

In a case similar to this one though involving discharge, *Audio Industries, supra*, the Court could not find substantial evidence to support the Board, because, like this case, the Board's position rested "upon two isolated incidents of dubious significance." 313 F.2d at 863. Nor could the Court support the Board in N. L. R. B. v. South Rambler Co., 324 F.2d 447 (8 Cir. 1963) upon a similar amount of evidence. There Judge Matthes said,

"Furthermore, an employer's general hostility to unions, without more, does not supply an unlawful motive as to a specific discharge. * * * An inference that a discharge of an employee was motivated by his union activity must be based upon evidence, * * * not upon mere suspicion, * * * and the burden of proving an improper mo-

---

7. As noted by the Trial Examiner,
 " * * * [T]he fact that certain statements in Haverland's testimony are not in accord with the undisputed facts cause me some serious concern as to the reliability of his testimony. Thus it is not true, as Haverland testified, that Travers told Thomas in the first interview that he would have to get the application approved by the home office, *and that he told Thomas in the second interview that the application had not been approved.*"

(The application was not returned until the second and last interview, when Thomas was told his name would be put in the hopper along with the rest of the applicants.)

Haverland also testified Travers said no charges had been filed against his company. (The Board's further reliance on a unilateral editing of Haverland's transcript testimony doesn't appear to be in order as the edited statement is meaningless.)

tive for discharge is upon the Board." at 449–50.

In the instant case the Board has even failed to meet the burden of proving as required in Cupples v. N. L. R. B., *supra*, that discrimination was a contributing cause of the failure to hire Thomas.

 The union activity or adherence of an applicant should be a neutral factor in the hiring process. The right to organize and belong to a union is a protected activity under the Act, but it is not a badge to shield the applicant from a consideration of his qualifications nor should it insure him an advantage over others not similarly disposed. Section 8 (a)(3) prohibits an employer from either encouraging or discouraging membership in a labor organization. The hiring process should normally proceed with a consideration of the relative qualifications of the applicants along with any other legitimate consideration that does not encroach upon statutorily protected activity and status; e. g., rights under the Civil Rights Act of 1964 to be free of discrimination in employment because of race, color, religion, sex or national origin. 42 U.S.C. § 2000e–2(a).

The order of the Board is set aside and the cross-application for enforcement is denied.