CRENLO, DIVISION OF GF
BUSINESS EQUIPMENT,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 75–1132.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 17, 1975.

Decided Dec. 31, 1975.

Rehearing and Rehearing En Banc
Denied Feb. 18, 1976.

J. Dennis O'Brien, LeFevere, Lefler, Hamilton & Pearson, Minneapolis, Minn., for petitioner.

Marjorie S. Gofreed, Atty., N. L. R. B., Washington, D. C., for respondent. John C. Miller, Acting General Counsel, John S. Irving, Deputy General Counsel, Elliott Moore, Deputy Associate General Counsel, and Allison W. Brown, Jr., Atty., N. L. R. B., Washington, D. C., appeared on the brief.

Before CLARK, Associate Justice,* and LAY and ROSS, Circuit Judges.

PER CURIAM.

This petition for review of an order of the National Labor Relations Board involves the discharge of six of petitioner's employees for successive partial strikes in violation of Section 8(a)(1) of the National Labor Relations Act and the discharge of one employee for an alleged violation of petitioner's "no solicitation" rule in violation of Section 8(a)(1) as well as Section 8(a)(3) of the Act.[1] The issue rests upon determination of facts made by the Board in its findings.

*The Facts*

The petitioner, Crenlo, Division of GF Business Equipment, Inc. (Crenlo), operates two plants in Rochester, Minnesota, where it manufactures sheet metal products, including metal cabinets and tractor cabs. On July 23, 1973, Local 161 of the General Drivers and Warehousemen and Helpers, International Brotherhood of Teamsters, petitioned the Board for an election at the Crenlo plants, and by stipulation an election was scheduled for September 12, 1973.

On August 15, 1973, Crenlo announced that its annual wage increase would be 25 cents per hour, effective August 18, for all production employees. There was some dissatisfaction at the increase, and some of the dissidents at the plant located at 1600 Fourth Avenue, N.W., Rochester, requested an immediate meeting with Crenlo management to discuss it. A meeting with Jerry Wollenburg, Crenlo's foreman, was arranged by the pressmen. At this meeting the pressmen indicated that the increase should have been 50 cents because of the increased cost of living. Wollenburg promised to present the employee position to the Crenlo management and then get back to the pressmen. About 1:30 p. m., Wollenburg was told by a pressman that work would stop at 2 p. m. if management did not "come down." Wollenburg, who had reported his previous noon meeting to Crenlo's top management, also reported this second conversation. He was instructed to tell any employee who stopped work to either return or punch out, leave the plant, and report to the personnel office the next morning for disciplinary action.

At 2 p. m. the pressroom employees stopped work and demanded an answer from Wollenburg. He followed his instructions and told them to return to work or punch out, leave the plant, and report to Personnel subject to disciplinary action. Some of the employees reported back to work. Some 26, however, were upset and angry that top manage-

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation.

1. 29 U.S.C. § 158:

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\* \* \* \* \* \*

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . . .

ment would not appear and chose to remain idle and repeatedly demand that top management come down to explain its position. Subsequently, they asked Wollenburg why no response was forthcoming and again requested that top management come down to talk over the controversy. Wollenburg explained that top management was not in the plant and that the plant manager, McKibben, could not act in their absence, although he was much concerned over the employees' demands. The controversy continued with the employees debating among themselves whether to return to work and finally, at about 2:55 p. m., they decided "to go back to work and give [management] more time to think about it and see what would happen in the morning." By 3 p. m. all of the employees had returned to work, but some indicated that another work stoppage would occur at 9:30 a. m. the following day.

The night or second shift of employees came on at 3:30 p. m. Shortly before that time, a first shift employee, Archie Asleson, who had played a leadership role in the first shift activity, told Wollenburg: "Today it was just the pressroom. Tomorrow the welders are with us." After the first shift went off work, they held a meeting and voted to stop work again at 9:30 a. m. the next morning to wait for top management to come down and discuss their wage demands. Some second shift employees attended the meeting. Wollenburg met with Plant Manager McKibben to determine if there were any ringleaders behind the action of the employees and if there were, who they might be. At this meeting they agreed as to the identity of the instigators of the trouble. Those agreed upon were the same ones who were subsequently terminated. The night or second shift workers discussed the day's activity during their dinner break at 6 p. m. and coffee time at 9 p. m. They voted to come in the next morning and give their support to the first shift in an effort to get top management to respond to their wage demands.

A check of the plant by management at 7 p. m. indicated that some of the welders were angry or worried about their jobs. Their work might be curtailed if the pressroom went out and production of parts ceased. One welder reputedly waived a sledge hammer and said, "If those bastards come down here, I'll cave their heads in."

On Friday, August 17, the first shift returned on schedule and began to work. Since rumors continued that there would be a work stoppage at 9:30 a. m., the top management met about 9 a. m. in General Manager Bouffard's office. Those present included Bouffard (General Manager, Guidenger (Personnel Manager), McKibben (Plant Manager), Stevens (General Foreman) and Wollenburg (Foreman). They discussed the previous day's activity, and Wollenburg furnished the group the names of the ringleaders in both shifts. Bouffard told Wollenburg to tell the employees to go back to work and if they did not do so, they were to punch out and report to Personnel on Monday morning, subject to disciplinary action.

The first shift employees gathered together at 9:30 a. m. in the pressroom. At about the same time, about 20 second shift employees, contrary to orders, entered the plant and began talking with the first shift employees in the work area. When Wollenburg ordered all of the first and second shift employees (about 60) to either return to work or punch out and leave, only 7 or 8 first shift employees returned to work. At 9:45 a. m., top management notified 6 of the employees that they were being terminated because of their leadership roles in the work stoppages.[2] The following Monday, a night or second shift employee, Adrian Brakke, was terminated because of his activity on the 17th and also because he had violated a Company rule

---

2. Among the six terminated that morning was Terry Rich, a second shift employee who had been active at the first shift meeting the previous day. The Board upheld his termination because he had violated a plant rule by coming on the premises during the first shift.

by soliciting an employee to join the Union during working hours.

The Regional Director, after investigation, refused to issue a complaint against Crenlo. The General Counsel of the Board reversed, however, and the two complaints were filed. After being consolidated, the cases were heard before an Administrative Law Judge, and he found violations of Sections 8(a)(1) and 8(a)(3) of the Act. The Board affirmed. We have examined the record and find that, with one exception, substantial evidence on the whole supports the findings of the Board and that the applicable law is with the Board. Accordingly, we direct enforcement of its order, except as to Adrian Brakke.

*The Applicable Law*

 We start with the proposition that Section 7 of the Act guarantees employees the right to join together to seek better terms, tenure, or conditions of employment. *NLRB v. Washington Aluminum Company,* 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962). Here the employees remained on company property in a sincere effort to meet with the management concerning a protest over wages. This they were entitled to do without being deprived of the protection of the Act. *NLRB v. Case, J. I., Co.,* 198 F.2d 919, 922 (8th Cir. 1952); *NLRB v. Kennametal, Inc.,* 182 F.2d 817, 819 (3d Cir. 1950). Under the circumstances here, the Board reasonably and correctly held that the employees did not forfeit the protection of the Act by engaging in two successive in-plant protests of brief duration. Foreman Wollenburg led the employees to believe what he said, that "Somehow I'll get somebody down here . . . I'll do what I can." When nothing happened, the employees went back to work. However, on the next morning, instead of the top management coming down, Wollenburg issued the same old orders to go back to work or suffer punishment. In only a quarter of an hour, the three top officials came down, but, having already decided to terminate six of the employee leaders, did not discuss the issue. Instead the termination orders were announced.

It appears clear to us that the first shift employees—unorganized as they were—had banded themselves together in a legitimate effort to present their grievances about wages to the management. Their action had no appreciable impact on company production and none was shown. There was no defiance, no violence, no unlawful conduct; nor were there other sporadic in-plant work stoppages or refusals to work, either in the regular shifts or overtime. All that the employees asked was that management meet and discuss wages. The employees were entitled to have their protest heard and to hear the reaction of management. On the morning of the 17th, they were but reacting individually to the Company's misrepresentations, its dilatory tactics, and its threats to take disciplinary action rather than engage in frank discussion.

The first shift employees who participated in the brief work stoppage should not have been discharged. Accordingly, we affirm the Board's findings and order the enforcement of the Board's order with respect to the discharge of the five first shift employees.

 We have more difficulty in finding substantial evidence on the record as a whole to support the Board's finding that Adrian Brakke was discriminatorily discharged in violation of Sections 8(a)(1) and 8(a)(3) of the Act. This is especially true in light of the Board's determination that Terry Rich, another second shift employee, could be discharged under the Act. Both Rich and Brakke were active union organizers. Both were singled out by management as leaders of the second shift meetings on August 16. Both violated the Company's plant rule by coming into the work areas during the first shift. The Board determined that Rich should not have gone into the pressroom and that to do so was unprotected activity. Although Brakke also had wrongfully gone into the working areas on the morning of the 17th,

the Board refused to uphold his discharge, apparently because of a number of facts differing from Rich's case. Brakke was not discharged until the next working day. In the meanwhile, the Company received a report that he had violated its "no solicitation" rule by asking another employee to sign a union card on company time. When the management realized that Brakke had been "into this as much as the other fellows" and that he had also broken both the rule that forbade his coming into work areas during the first shift and the rule that forbade soliciting on company time, Brakke was discharged. The Board found the discharge discriminatory because it involved in part both a valid and invalid ground. The Board reached this decision by determining that the "no solicitation" rule was overbroad and vague.

In support of its position on appeal, the Board recites the long-recognized principle that it is no defense to a claim of discriminatory discharge that the discharge may have had another valid ground. The Board directs our attention to three cases: *Reliance Insurance Companies v. NLRB*, 415 F.2d 1, 7 (8th Cir. 1969); *Mead and Mount Construction Co. v. NLRB*, 411 F.2d 1154, 1155–1157 (8th Cir. 1969); and *Cupples Co., Manufacturers v. NLRB*, 106 F.2d 100, 117 (8th Cir. 1939). In *Cupples*, the court upheld the Board's determination that, in a dispute between an affiliated and an independent union the company's business reasons for shutting down its match department could not overcome the discrimination evident in its failure to rehire members of the affiliated union. In *Reliance*, the court refused to uphold the Board's determination that a failure to hire was based upon both sound business reasons and discrimination for past union activity. It held that the business reasons were the significant motive for the failure to hire and that no union animus had been substantially proved on the record as a whole. In *Mead*, the court refused to uphold a Board determination that the discharge of a steward had been partly for discriminatory reasons in violation of the Act. The court there determined that no evidence of union animus had been shown.

Unfortunately, none of these cases seem apposite here where the discharge rests upon two entirely separate and independent grounds, one of which the Board has independently used and approved. The first ground, discharge for going into the work areas during the first shift, is the same conduct upon which the discharge of the only other discharged second shift employee, Terry Rich, was predicated. The second ground, violation of the "no solicitation" rule, was on its own an illegal basis for discharge, according to the Board's interpretation of the case law. Here, however, the Board by upholding Rich's discharge, has acted despite whatever union animus the rule's enforcement may have demonstrated. Both Rich and Brakke were active union organizers among the second shift employees, and both had wrongfully entered the press room along with other second shift employees on the morning of the work stoppage. Yet only Rich's discharge was approved by the Board. The sole difference between the two was the intervening passage of a weekend in the receipt of the evidence of solicitation by Brakke on company time. By approving Rich's discharge, the Board made the law of the case, i. e., union animus does not invalidate a discharge for engaging in unprotected activity. The irrelevance of the general rule, that a discharge based partially upon valid grounds and partially upon invalid grounds must be reversed as discriminatory, is apparent. Here the Board's own findings and determination fixed the independence of the first ground for Brakke's discharge. The validity of the Company's "no solicitation" rule is, therefore, not involved and we do not reach it.

When the record in a Board determination presents facts that propose conflicting inferences, it is not for us to disagree with the findings of the Board. *NLRB v. Whitin Machine Works*, 204 F.2d 883, 887–88 (1st Cir. 1953). How-

206

ever, when the Board's determination presents conflicting results unsupported by substantial evidence on the record as a whole, the decision is suspect. By allowing Rich's discharge to stand, the Board determined that, at least in this case, the second shift's intrusion during first shift working hours was an adequate, independent basis for discharge. Consistency requires that Brakke's discharge too must be upheld.

Accordingly, we affirm so much of the Board's order as pertains to the five first shift employees and order its enforcement. As to Brakke, we grant the petition for review and reverse the determination made by the Board that he must be reemployed.

It is so ordered.

ROSS, Circuit Judge (dissenting).

I dissent from that portion of the opinion which holds that the first shift employees who organized and participated in their second work stoppage in less than twenty hours should not have been discharged. At the first work stoppage the employees made their wage demands known to management but rather than wait even twenty-four hours for a response, or request a meeting between one of their representatives and management after a reasonable wait, they not only attempted to enforce their demands by another immediate work stoppage but also successfully encouraged second shift workers to illegally enter the plant to join them. It seems ludicrous to me that the ringleaders of the second work stoppage are being protected and some of the ones who joined with them from the second shift are not.

I consider this an exceedingly unfortunate precedent which is likely to lead to more labor strife and conflict rather than do anything to lessen those possibilities in the future.