**HALSTEAD METAL PRODUCTS, A DIVISION OF HALSTEAD INDUSTRIES, INCORPORATED, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**HALSTEAD METAL PRODUCTS, A DIVISION OF HALSTEAD INDUSTRIES, INCORPORATED, Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Petitioner.**

Nos. 90–1853, 90–1868.

United States Court of Appeals, Fourth Circuit.

Argued April 10, 1991.

Decided July 3, 1991.

Terry Allen Clark, argued (James F. Edwards, Jr., on brief), Edwards, Ballard, Bishop, Sturm, Clark & Keim, Spartanburg, S.C., for petitioner.

Lisa Nanette Richardson, argued (Jerry M. Hunter, Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Collis Suzanne Stocking, Supervisory Atty., on brief, N.L.R.B., Washington, D.C., for respondent.

Before WIDENER, Circuit Judge, CHAPMAN, Senior Circuit Judge, and WILLIAMS, District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

CHAPMAN, Senior Circuit Judge:

Donald Hazelwood ("Hazelwood") filed an unfair labor practice complaint with the National Labor Relations Board ("Board") against Halstead Metal Products ("Halstead"), claiming that Halstead refused to rehire him because he had engaged in protected concerted activity. The Administrative Law Judge ("ALJ") concluded that Halstead had committed an unfair labor practice under the National Labor Relations Act (the "Act"), and the Board affirmed the decision. Halstead now appeals, and we reverse and remand for proceedings consistent with this opinion.

## I.

Halstead manufactures copper tubing products, employing approximately 500 employees at its facility in Pine Hall, North Carolina. It operates this facility on a continuous 24 hour basis. The "C" maintenance crew at the plant worked a "4–3" schedule under which a crew member worked a twelve hour night shift for four nights with three nights off the first week and worked a twelve hour shift for three nights with four nights off the next week. Hazelwood worked on the "C" crew from December 2, 1986 to August 16, 1988.

In August 1988, Halstead, in an attempt to improve the efficiency of the maintenance program, proposed a schedule change which would require the workers to work seven consecutive nights and receive two nights off. When Hazelwood believed this schedule change was imminent, he voluntarily resigned, stating that, although he hated to leave, he could not work seven consecutive nights due to a sleep disorder.

The following Saturday, August 20, 1988, the remaining members on the "C" crew were informed by a bulletin board notice that the new schedule was going into effect. The crew worked approximately two hours and then informed their foremen that they were not going to continue working. The crew requested a meeting with management to address their concerns over the new schedule. The foremen could not reach any upper management at that time, and the workers clocked out, walked out of the plant and congregated at a nearby picnic area called the "oak tree." One of the

members then called Hazelwood, and he joined the crew at the oak tree. Soon after Hazelwood had joined the group, representatives of Halstead's management arrived and discussed the scheduling problem. When management promised to correct the problem the next day, the crew returned to work. At that time, Hazelwood asked Piper, the plant manager, for his job back. Piper encouraged Hazelwood to fill out an application stating that "we need good maintenance men."

The following Monday, August 22, 1988, Hazelwood went to the plant employment office and completed an application. Hazelwood told Employment Manager Diane Coffill, who was responsible for hiring, that Piper had told him to file the application. After speaking with Piper, Coffill accepted the application and checked Hazelwood's employment record. She then told Hazelwood that she would let him know when the schedule was straightened out. A week later, Hazelwood returned to the plant to find out why he had not heard from Coffill. Coffill told him that she had not heard about the schedule, but would check with Piper. Later, Coffill talked with Piper who allegedly directed Coffill not to rehire Hazelwood because he had demonstrated with the "C" crew workers at the oak tree. When Hazelwood checked with Coffill during the next several weeks, Coffill always told him that the schedule had not been worked out.

Eventually Halstead resolved the scheduling problem by discarding the proposed "7–2" schedule for a "4–4" schedule with the workers on four days and off four days. Hazelwood was not rehired, his position remained vacant, and Halstead actively sought applications for maintenance men. In March 1989, Hazelwood spoke with Halstead's former Employee Relations Director Tommy Cook. Cook told Hazelwood that he had spoken with Coffill and that she had said that Piper did not want to hire Hazelwood because of the incident at the oak tree.

Hazelwood then filed his complaint with the Board, alleging that he was punished for participating in protected concerted activity. The ALJ agreed with Hazelwood, finding that Halstead had violated section 8(a)(1) of the Act by refusing to rehire Hazelwood because of the concerted activity. On review, the Board affirmed the ALJ's decision. Halstead now appeals.

## II.

The Board's findings of fact are conclusive if they are supported by "substantial evidence on the record considered as a whole." NLRA § 10(e), 29 U.S.C. § 160(e). If the Board misconstrues the Act or makes an error of law, the court reviews the decision *de novo. American Trucking Assocs. v. NLRB*, 734 F.2d 966 (4th Cir. 1984), *cert. denied*, 473 U.S. 904, 105 S.Ct. 3524, 87 L.Ed.2d 650 (1985). The court, however, should accept the Board's construction of the Act if it is reasonably defensible. *NLRB v. Local Union No. 103, Iron Workers*, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978).

## III.

Section 7 of the Act (29 U.S.C. § 157) guarantees employees the right to engage in "concerted activities for the purpose of ... mutual aid or protection." Section 8(a)(1) of the Act (29 U.S.C. § 158(a)(1)) implements this guarantee by making it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of rights guaranteed by section 7. These two sections of the Act effectively insulate employees from discharge, refusal to rehire, or other employer retaliation for engaging in concerted activities for mutual aid or protection, "even though no union activity be involved, or collective bargaining be contemplated." *Joanna Cotton Mills Co. v. NLRB*, 176 F.2d 749, 752–53 (4th Cir.1949). Discrimination in hiring is just as significant as a discriminatory discharge for, as the Supreme Court observed in *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 185, 61 S.Ct. 845, 848, 85 L.Ed. 1271 (1941), "the effect of such discrimination is not confined to the actual denial of employment; it inevitably operates against the whole idea of the legitimacy of organization."

■ Employees who collectively refuse to work in protest over wages, hours, or other working conditions are engaged in "concerted activities" for "mutual aid or protection" within the meaning of the Act. *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 17, 82 S.Ct. 1099, 1104, 8 L.Ed.2d 298 (1962), *accord United Merchants & Mfrs., Inc. v. NLRB*, 554 F.2d 1276, 1278 (4th Cir.1977). Accordingly, retaliatory action motivated by an employee's participation in, or instigation of, such activity violates section 8(a)(1) of the Act. *Washington Aluminum*, 370 U.S. at 17, 82 S.Ct. at 1104. The broad protection of the Act applies with particular force to unorganized employees, who, because they have no designated bargaining representative, have "to speak for themselves as best they [can]." *Id.* at 14, 82 S.Ct. at 1103.

This appeal presents three issues regarding section 8(a)(1) of the Act: First, whether Hazelwood and the "C" crew workers should be considered "employees" under the Act while they were protesting at the oak tree; second, whether Hazelwood and the "C" employees were engaged in "protected concerted activities" under the Act; and third, whether Halstead refused to rehire Hazelwood for his "concerted activity" in joining the protest at the oak tree.

### IV.

■ As a threshold matter, an employer only violates the Act if the individuals against whom he discriminates are employees for the purposes of the Act. In other words, unless the workers who protest are employees, their concerted activity is not protected by the Act. We first address whether Hazelwood and the other "C" crew workers were actually employees under the Act when the alleged concerted activity occurred.

A. Whether Hazelwood should be considered an employee for purposes of section 8(a)(1) of the Act.

■ It is undisputed that Hazelwood voluntarily resigned on August 16, 1988, because he was dissatisfied with the proposed work schedule. Because Hazelwood actually resigned, he was not protected by the Act from future discrimination, even if the discrimination arose from participation in concerted activities with employees who were protected by the Act. *See Model A & Model T Motor Car Reproduction Corp.*, 259 N.L.R.B. 555 (1981) (section 7 did not protect former employee who had quit job from legal action by former employer).

However, once Hazelwood reapplied for employment at Halstead, Halstead had to treat Hazelwood as if he were an employee for purposes of the Act. It is well settled that a job applicant is to be treated as an employee entitled to protection under the Act. *See, e.g., NLRB v. Mt. Desert Island Hosp.*, 695 F.2d 634, 638 (1st Cir.1982); *NLRB v. Southern Plasma Corp.*, 633 F.2d 1210, 1210 (5th Cir.1981); *Reliance Ins. Cos. v. NLRB*, 415 F.2d 1, 6 (8th Cir.1969); *Time–O–Matic, Inc. v. NLRB*, 264 F.2d 96, 99 (7th Cir.1959); *see also H.B. Zachry Co. v. NLRB,* 886 F.2d 70 (4th Cir.1989). In this case, Hazelwood orally applied for employment at the oak tree and filed a formal application two days later at the plant. The ALJ and the Board found that Hazelwood was an employee for the purposes of the Act and was entitled to the Act's protections. We find no error in this conclusion and affirm this finding.

B. Whether members of the "C" crew were employees during the activity at the oak tree.

■ The Board also affirmed the ALJ's finding that the "C" crew workers "walked out" as employees and did not resign from their jobs as Hazelwood initially had done. Halstead contends that the "C" crew employees quit their jobs with no intention of returning; therefore, these individuals were not employed during the protest and were not protected by the Act. For support, Halstead points to the testimony of two of the crew members who specifically used the word "quit" in reference to their action in leaving the plant on August 20, 1988.

An employee's use of the word "quit" in a mass walk out does not always mean that the employee intended to terminate his or her employment. *See Top of Waikiki*, 176 N.L.R.B. 76 (1969), *enforced on other*

*grounds,* 429 F.2d 419 (9th Cir.1970). Accordingly, we must determine on the basis of their conduct whether the employees intended only to protest by their walk out or to quit by resignation. *Grismac Corp.,* 205 N.L.R.B. 1108, 1118 (1973), *enforced,* 492 F.2d 1247 (7th Cir.1974) (unpublished); *see, e.g., ABC Prestress & Concrete,* 201 N.L.R.B. 820, 824–25 (1973) (though one employee used word "quit," context in which the protest occurred clearly indicated that employees considered it a walk out).

The Board found that the employees walked out rather than resigned, and this is supported by the record. The conduct of the "C" crew employees clearly indicates that they intended to walk off rather than resign. First, only two of the nine "C" crew employees used the word "quit," and those two also used the term "walk out." Second, the "C" crew employees never told their foremen that they were resigning, only that they were not going to work until they could talk to upper management. Third, the employees did not submit termination notices or ask for final paychecks. Fourth, Halstead interpreted the crew's action as a walkout rather than a resignation. The foremen told Piper that the crew had "walked off" and were waiting up at the oak tree. Management then went to the oak tree and persuaded the crew to return to work, promising to work out the schedule in the morning. Finally, it is highly unusual for nine employees to terminate their employment at the same time, and it is more likely that the employees had banded together to protest the new schedule. We find that substantial evidence supports the Board's conclusion that the "C" crew employees staged a walkout in protest of the work schedule.

### V.

■ Substantial evidence also supports the finding that Hazelwood and the other "C" crew workers were engaged in protected concerted activities when they were protesting at the oak tree. The "C" crew walked out over the new work schedule and demanded to talk with management. When the workers could not reach management, the workers went to the oak tree in protest. This type of protest clearly falls within the protection of section 7 of the Act. *See NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 17, 82 S.Ct. 1099, 1104, 8 L.Ed.2d 298 (1962) (employees who refuse to work in protest over wages or hours are engaged in "concerted activities" within the meaning of the Act). Accordingly, if Halstead refused to rehire Hazelwood due to any retaliatory motive resulting from his participation in the concerted activity at the oak tree, the company committed an unfair labor practice in violation of section 8(a)(1) of the Act.

### VI.

The final issue is whether Halstead refused to rehire Hazelwood because of his "protected concerted activity" in joining the protest at the oak tree. In reviewing this issue, we must determine whether there is substantial evidence to support the finding that Halstead's refusal to rehire Hazelwood was motivated by retaliation for his participation in the "protected concerted activity."

■ In 1983 the Supreme Court fashioned a test for courts to apply in determining whether an employer's motivation in a discharge or a refusal to rehire is improper under the Act. In *NLRB v. Transport Management Corp.,* 462 U.S. 393, 401–403, 103 S.Ct. 2469, 2474–2475, 76 L.Ed.2d 667 (1983), it held that when an employee can show that employer opposition to protected concerted activity was a factor in an employer's decision to take adverse action against an employee, the adverse action will be presumed to be an unfair labor practice unless the employer is able to demonstrate, as an affirmative defense, that the same action would have been taken in the absence of protected conduct. *See Salem Leasing Corp. v. NLRB,* 774 F.2d 85, 87–88 (4th Cir.1985); *NLRB v. Daniel Constr. Co.,* 731 F.2d 191, 197 (4th Cir. 1984). A factor that evidences discriminatory motivation is an employer representative's admission of unlawful intent. *NLRB v. Ferguson,* 257 F.2d 88, 90 (5th Cir.1958). Direct evidence of motive is rarely available, and the Board may rely on circumstantial evidence to determine motive. *NLRB v. Instrument Corp.,* 714 F.2d 324, 328 (4th Cir.1983).

In this case, both the ALJ and the Board found that Halstead refused to rehire Hazelwood for improper reasons and therefore committed an unfair labor practice. The ALJ based his decision on circumstantial as well as some direct evidence indicating that Halstead refused to rehire Hazelwood because of his activity at the oak tree. As circumstantial evidence, the ALJ pointed to several "coincidences" in support of this conclusion: (1) Halstead never informed Hazelwood that it had gone back to the old schedule, but instead led him to believe that it was still working on the new schedule; and (2) Halstead needed maintenance employees and continued to actively seek applications even though Hazelwood, who had a good work record and was admittedly qualified for the job, had a pending application. However, the ALJ relied primarily upon the direct evidence from Coffill, Halstead's employment manager, who testified that Piper, the plant manager, told her not to rehire Hazelwood because he was "with that bunch up at the tree."

To rebut this evidence, Halstead offered two "legitimate" reasons for not rehiring Hazelwood: First, Hazelwood quit without notice over a proposed schedule change; second, Halstead claimed that it wanted to replace Hazelwood's unskilled position with a skilled electrician position. In addition, Halstead argued that Coffill fabricated her testimony as a result of an intimate relationship she had with Tommy Cook, who had helped Hazelwood file his unfair labor practice claim.

The ALJ rejected the purported "legitimate" reasons as pretextual and refused to allow Halstead to cross examine Coffill on her relationship with Cook and Hazelwood. The ALJ then determined that the circumstantial evidence combined with the direct testimony of Coffill established that Halstead committed an unfair labor practice by refusing to rehire Hazelwood because of his prior protected activity. On appeal to the Board, the Board affirmed the ALJ's decision, finding that it was supported by substantial evidence.

If Coffill's testimony were true, the Board may be correct in concluding that substantial evidence supported the ALJ's decision finding that Halstead had committed an unfair labor practice. However, since the ALJ did not allow Halstead to impeach Coffill on the issue of potential bias, the Board could not review the credibility of Coffill or the correctness of the ALJ's decision. We find that the ALJ erred as a matter of law by refusing to allow Halstead to impeach Coffill. We also hold that without Coffill's direct testimony, the circumstantial evidence was not sufficient to prove an unfair labor practice.

We are aware that an ALJ's credibility findings, when adopted by the Board, should generally be accepted by the reviewing court. *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir.1983). In this case, however, the issue is not the extent to which the reviewing court can challenge an ALJ's credibility findings, but whether the ALJ abused his discretion by rejecting Halstead's request to impeach Coffill on the record. Accordingly, this is not an issue of fact, but one of law. As the Supreme Court explained in *NLRB v. Indiana & Mich. Elect. Co.*, 318 U.S. 9, 63 S.Ct. 394, 87 L.Ed. 579 (1943):

> The Act accords a great degree of finality to the Board's findings of fact, and this Court has been insistent that the admonition of the Act be strictly observed. But courts which are required upon a limited review to lend their enforcement powers to the Board's orders are granted some discretion to see that the hearings out of which the conclusive findings emanate do not shut off a party's right to produce evidence or conduct cross-examination material to the issue. The statute demands respect for the judgment of the Board as to what the evidence proves. But the court is given the discretion to see that before a party's rights are finally foreclosed his case has been fairly heard. *Findings cannot be said to have been fairly reached unless material evidence which might impeach, as well as that which will support, its findings, is heard and weighed.*

*Id.* at 28, 63 S.Ct. at 405 (emphasis added); *accord NLRB v. Poinsett Lumber & Mfg. Co.*, 221 F.2d 121, 123 (4th Cir.1955).

In this case, Coffill was Hazelwood's principal witness as to the employer's motivation, because she was the only one who testified as to Piper's reason for not rehiring Hazelwood. Halstead attempted to discredit Coffill's testimony by proving that Coffill testified in favor of Hazelwood's position as a result of an ongoing intimate relationship with Cook, the former Halstead Employee Relations Director. Cook had become quite hostile to his former employer and had helped numerous employees file causes of action against Halstead, including Hazelwood. In addition, Cook had previously threatened Piper and had personally filed complaints with the Board, the Equal Employment Opportunity Commission, and even a civil action for defamation. All of these complaints had been dismissed, however, and Halstead won a defamation counterclaim against Cook in the civil suit. At the same time Cook was filing these complaints, he was allegedly involved in an intimate relationship with Coffill. Halstead argued that Cook used Coffill to get back at Halstead. Although the ALJ heard the offers of proof, he refused to admit the evidence. The ALJ concluded that Coffill's relationship to Cook was not relevant to the issues in this case, even though Cook had helped Hazelwood file his complaint with the Board.

Impeachment evidence is crucial in Board proceedings, since the ALJ sits as judge and jury. *NLRB v. Poinsett Lumber & Mfg. Co.*, 221 F.2d 121, 123 (4th Cir.1955). Halstead contends that the excluded evidence would have proved that Coffill was biased in favor of Hazelwood as a result of her relationship with Cook and that she was prejudiced against Halstead because of Cook's feud with Piper. We find that this evidence of bias and prejudice would be relevant in assessing Coffill's credibility, and it was error to exclude it. *See United States v. Harvey*, 547 F.2d 720, 723 (2d Cir.1976) (district court erred in refusing to admit testimony concerning intimate relationship between witness and defendant). By excluding this evidence, the ALJ prevented Halstead from effectively cross-examining Coffill so as to test her credibility.

Thus, the hearing was fundamentally unfair. *See Barrus Constr. Co. v. NLRB*, 483 F.2d 191, 194 (4th Cir.1973); *NLRB v. Bata Shoe Co.*, 377 F.2d 821, 826–27 (4th Cir.), *cert. denied*, 389 U.S. 917, 88 S.Ct. 238, 19 L.Ed.2d 265 (1967).

Accordingly, we must reverse the ALJ's decision and remand the case to allow Halstead to fully cross-examine Coffill as to her relations with Cook in its effort to impeach her by showing bias. Only by considering all of the relevant evidence may the ALJ arrive at a fair and just conclusion, and only by reviewing all of the relevant evidence in the record can the Board and any reviewing court arrive at a fair and just decision on appeal.

## VII.

For the foregoing reasons, the decision of the Board is affirmed in part and reversed in part, and we remand this case for further proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED AND REMANDED.